# Illinois Official Reports

## Appellate Court

---

### *People v. Munoz-Salgado*, 2016 IL App (2d) 140325

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MUDY MUNOZ-SALGADO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0325 |
| Filed | September 8, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 12-CF-2293; the Hon. T. Clint Hull, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas A. Lilien and Fletcher P. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer, Joan M. Kripke, and Mary Beth Burns, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Spence concurred in the judgment and opinion. |

¶ 1    Following a jury trial in the circuit court of Kane County, defendant, Mudy Munoz-Salgado, was convicted of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2012)), aggravated battery (720 ILCS 5/12-3.05(c) (West 2012)), and unlawful restraint (720 ILCS 5/10-3(a) (West 2012)). He was sentenced to concurrent prison terms of seven years for aggravated criminal sexual assault and three years for each of the other offenses. The alleged victim, J.L.,[1] resides in another state and did not testify at trial. However, the statements that she made to an emergency room nurse were admitted into evidence. Defendant argues that admitting the statements into evidence violated his sixth amendment right to confront the witnesses against him. Defendant also contends that the trial court erred by ruling that the rape-shield statute (725 ILCS 5/115-7 (West 2014)) barred evidence that J.L. reported engaging in sexual activity within 72 hours prior to the emergency room examination. We affirm.

¶ 2    At trial, video from a surveillance camera at the Lexington Inn hotel in Elgin was admitted into evidence and shown to the jury. The video showed that, at about 12 p.m. on November 13, 2012, defendant approached J.L. in the first floor hallway, spoke with her, took her by the wrist, and led her upstairs into a hotel room. A short time later, J.L. left the room and walked downstairs. Minnie Cotton, a housekeeper at the hotel, testified that at about noon she encountered a woman in the first floor hallway who was crying. The police were summoned. Officers who spoke with J.L. at the hotel indicated that she was crying. Based on what J.L. told the police, officers took defendant into custody after encountering him in the hotel's parking lot. An officer drove J.L. to the hospital. A search of the hotel room that J.L. had been taken to led to the discovery of several condoms in their wrappers and one empty wrapper.

¶ 3    Defendant was interviewed by police while in custody. An audio recording of part of the interview was admitted into evidence and played for the jury. Defendant indicated that he lived in Missouri but was working with a construction crew on a project in the Elgin area. He had been staying at the hotel for about two weeks. Other members of the construction crew were also staying there. Defendant was acquainted with J.L., who was, in his words, "somebody's woman in the crew." About a month earlier, defendant had exchanged text messages with J.L. and spoken with her on the telephone. They had arranged to meet in Kansas City to have sex. J.L. told defendant to send her $200. Defendant sent her the money, but she did not show up in Kansas City, and defendant did not see her again until November 13, 2012, when he encountered her at the hotel during his lunch break. He asked her why she did not show up for the planned meeting in Kansas City. J.L. made reference to defendant being married. Defendant asked J.L. whether she wanted to go to the hotel room with him. She declined because she was going to see "her man" during lunch. At that point defendant grabbed J.L.'s arm and told her to go up to his room. They got to the door, and J.L. started to walk away while defendant was retrieving his key. He grabbed her and pulled her into the room. Asked what he was thinking when this took place, defendant responded, "I was pretty

_____

[1]We note that, in his briefs, defendant uses the victim's full name. It is our practice to refer to victims of sex offenses by initials so as to protect their privacy. We strongly urge the parties to appeals arising from sex-offense prosecutions to do the same.

much thinking about my $200 and I was horny." Defendant understood that J.L. did not want to go into his room. When they got into the room, they had sex. J.L. said that defendant was hurting her, but he did not stop.

¶ 4    Kristy Sheehan testified for the State that she was an emergency room nurse at Sherman Hospital in Elgin. Her duties included performing sexual assault kits on patients who reported having been sexually assaulted. A sexual assault kit contains swabs and containers for the collection of evidence. Sheehan explained that medical personnel performing a sexual assault kit "are trying to collect any kind of debris, semen, hair follicles, oral swabs, so any DNA samples inside, and clothes." Vaginal swabs and urine samples are also taken. On cross-examination, Sheehan acknowledged that the primary purpose of a sexual assault kit is to collect evidence. When a female patient reports a sexual assault, a gynecological examination is performed. Medical personnel also look for bruising, bite marks, and other signs of trauma.

¶ 5    Sheehan testified that on November 13, 2012, at about 3:30 p.m., she met with J.L. in a treatment room. A police officer was present, but the officer left the treatment room before Sheehan began her examination. J.L. was cooperative but anxious, and she became very tearful when Sheehan started asking her questions. Sheehan testified, "Like any patient, I ask what brought her in that day." Sheehan also asked J.L. how long it had been since the alleged sexual assault occurred and whether J.L. had taken a shower, removed any clothing, or gone to the bathroom since it occurred. Sheehan explained that those questions were "[f]or the collection of evidence." Sheehan further testified, "We ask multiple questions of what had happened, meaning, where, if there was any penetration, if so, where the penetration was." Sheehan testified that J.L. told her that defendant threw her face-down on a bed, held her down, put on a condom, and, in Sheehan's words, "forcefully put his penis inside her." J.L. indicated that, prior to the assault, defendant had dragged her by the wrist.

¶ 6    Sheehan observed bruising on J.L.'s wrist and a black scuff mark on her ankle. Sheehan collected swabs from J.L. and was present when a physician collected a vaginal swab from J.L. Sheehan testified that she observed spotting of blood in J.L.'s vaginal vault. Medically, the presence of spotting blood indicated "[v]aginal trauma or force to the vaginal area." On cross-examination, Sheehan indicated that there were "many reasons why somebody could be spotting." She acknowledged that it was possible to have spotting with consensual sex "if it is rough sex" or there was "little to no lubrication."

¶ 7    Defendant testified that he had met J.L. while working on a construction job in Milwaukee. J.L.'s boyfriend was on the construction crew. Thereafter, they spoke on the telephone and exchanged text messages. They had planned to meet again and to have sex, and defendant sent J.L. $200. J.L. did not show up for the meeting. Defendant also testified that he had not actually gone to meet with J.L. He added, "I'm married, so it didn't matter to me so I changed my phone number."

¶ 8    Defendant encountered J.L. again on November 13, 2012, at the Lexington Inn. He was surprised to see her, and she appeared to be surprised to see him. J.L. was upset because defendant had changed his phone number. Defendant asked J.L. to come to his hotel room. He touched her hand but did not drag her or pull her up the stairs. J.L. was worried that someone would see them. J.L. started to walk away. Defendant thought she was playing a game, and he pulled her back. Once they were inside defendant's room, defendant put on a condom, and they had sex. At one point she said that defendant was hurting her, so they

changed positions. J.L. never tried to push defendant away. She never screamed or yelled, and she was not crying. After they were done, J.L. calmly left the room. Defendant denied that he forced J.L. to have sex with him.

¶ 9 We first consider whether defendant's right to confront the witnesses against him was violated. The sixth amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The right of confrontation applies to testimonial evidence. Thus, "a testimonial statement of a witness who does not testify at trial is *never* admissible unless (1) the witness is unavailable to testify, and (2) the defendant had a prior opportunity for cross-examination." (Emphasis in original.) *People v. Stechley*, 225 Ill. 2d 246, 279 (2007) (plurality opinion) (citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). In order to qualify as "testimonial," a witness's statement must be (1) made in a solemn fashion and (2) intended to establish a particular fact. *Id.* at 281-82.

¶ 10 In *Stechley*, the parties disagreed as to whether the intent to establish a particular fact must be that of the declarant (*i.e.*, the witness) or of one eliciting the statement from the declarant. A majority of the *Stechley* court concluded that the answer depends on whether the witness's statement was elicited through police interrogation.[2] In doing so, the *Stechley* court answered in the affirmative a question that the United States Supreme Court had reserved in *Davis v. Washington*, 547 U.S. 813, 823 n.2 (2006): whether statements to persons other than law enforcement officers can be subject to the confrontation clause.

¶ 11 As noted in the plurality opinion in *Stechley*, 225 Ill. 2d at 267-68, *Davis* teaches that statements "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are not testimonial. *Davis*, 547 U.S. at 822. On the other hand, statements are testimonial (and thus within the ambit of the confrontation clause) "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* A majority of the *Stechley* court agreed that, for confrontation clause purposes, "police interrogation" is questioning by police "or those whose 'acts [are] acts of the police.' " *Stechley*, 225 Ill. 2d at 284 (quoting *Davis*, 547 U.S. at 823 n.2); *id.* at 330 (Thomas, C.J., dissenting, joined by Karmeier, J.). (We note that *Davis* merely assumed, without deciding, that "police interrogation" includes questioning by those acting on behalf of the police. *Davis*, 547 U.S. at 823 n.2.)

¶ 12 In contrast, a majority of the *Stechley* court held that it is the declarant's intent that determines whether statements outside the context of police interrogation are testimonial. The relevant question in that setting is whether the declarant intended to " 'bear testimony against the accused.' " *Stechley*, 225 Ill. 2d at 291 (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)). The declarant's intent may be ascertained by asking whether a reasonable person in his or her position " 'would anticipate his statement being used against the accused in investigating and prosecuting the crime.' " *Id.* (quoting *Cromer*, 389 F.3d at 675). The United States Supreme Court has since held, however, that "a statement cannot fall

---

[2]Although there was no majority opinion in *Stechley*, a majority of the members of the court were in agreement on this point. *Stechley*, 225 Ill. 2d at 284, 289; *id.* at 330 (Thomas, C.J., dissenting, joined by Karmeier, J.).

within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*, 576 U.S. ___, ___, 135 S. Ct. 2173, 2180 (2015). The Court drew no distinction between statements obtained during police interrogation and statements obtained in other contexts. Indeed, the statements at issue in *Clark* did not arise from police questioning; they were made by a three-year-old to a preschool teacher who observed indications of possible child abuse.

¶ 13    While declining to adopt a categorical rule that statements to individuals other than law enforcement officers are beyond the reach of the confrontation clause, the Court observed that "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* at ___, 135 S. Ct. at 2181. The Court concluded that the teacher in *Clark* elicited statements from the child primarily for the purpose of ascertaining whether the child could safely be released to his guardian at the end of the school day. *Id.* at ___, 135 S. Ct. at 2181. Because gathering evidence for prosecuting an offense was not the primary purpose of the conversation between the teacher and the child, the child's statements were not testimonial. This was true despite the fact that the teacher was legally required to report abuse to government authorities. *Id.* at ___, 135 S. Ct. at 2182-83.

¶ 14    Here, defendant contends that, given the circumstances surrounding Sheehan's examination of J.L., "[a]ny reasonable person in [J.L.'s] position would have anticipated that her statements would be used in a trial." That alone, however, does not make the statements testimonial. The record here shows that Sheehan conducted a physical examination with the two-fold purpose of collecting physical evidence to assist in the investigation and possible prosecution of a suspected crime and ensuring that J.L. received whatever medical attention she needed. Attempting to draw a parallel with *People v. Spicer*, 379 Ill. App. 3d 441 (2007) (which we will get to shortly), defendant argues that "[e]ven if some of [Sheehan's] actions were related to treating [J.L.], the bulk of them were related to gathering evidence on behalf of the police." But much of the examination was designed to collect purely physical evidence that raises no confrontation clause concerns. The germane question is not whether Sheehan's actions, collectively, were for the primary purpose of gathering evidence but whether the verbal exchanges she engaged in with J.L. were primarily for that purpose. We conclude that they were not. A medical examination was clearly both necessary and appropriate to ascertain whether J.L. suffered any injuries and whether treatment was necessary. The examination properly entailed obtaining a history from the patient of the events leading her to visit the emergency room.

¶ 15    In *Spicer*, the First District held that a sexual assault victim's statement to an emergency room doctor that she had been "raped and tied" was testimonial. *Id.* at 448. Relying on *Davis*, the *Spicer* court reasoned that the statement did not occur during the course of an ongoing emergency. (That conclusion rested, in part, on evidence that the victim had indicated that she did not want medical attention and that the police waited for about seven hours before taking her to the hospital.) The United States Supreme Court has since made clear, however, that "whether an ongoing emergency exists is simply one factor *** that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Michigan v. Bryant*, 562 U.S. 344, 366 (2011); accord *State v. Hill*, 336 P.3d 1283, 1288 (Ariz. 2014) ("We cannot say *** that a statement made in response to a question by a medical provider in connection with non-emergent medical care necessarily is testimonial simply because the victim does not require *urgent* medical attention." (Emphasis in original.)).

¶ 16    We also find no error in the trial court's refusal to permit defendant to introduce evidence that J.L. had engaged in sexual activity within 72 hours before Sheehan examined her. Defendant sought to admit this evidence for the purpose of showing that the spotting of blood that Sheehan observed was not necessarily related to J.L.'s encounter with defendant. The trial court concluded that the evidence was inadmissible under the Illinois rape-shield statute, which provides, in pertinent part, as follows:

> "In prosecutions for *** aggravated criminal sexual assault *** the prior sexual activity or the reputation of the alleged victim *** is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim *** with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim *** consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." 725 ILCS 5/115-7 (West 2014).

Defendant did not seek to admit evidence that he had a prior sexual relationship with J.L., so the question is whether the admission of evidence that J.L. engaged in sexual activity with someone other than defendant within 72 hours of the sexual assault examination was constitutionally required.

¶ 17    The constitution affords a defendant the right to offer evidence that is "*directly* relevant to matters at issue in the case, notwithstanding that it concern[s] the victim's prior sexual activity." (Emphasis in original.) *People v. Santos*, 211 Ill. 2d 395, 405-06 (2004) (alleged victim's past sexual conduct was a collateral matter, so her prior inconsistent out-of-court statements about that subject were not admissible for purposes of impeachment). "The 'constitutionally required' exception to the rape-shield statute 'should be construed narrowly, but also fairly.' " *People v. Summers*, 353 Ill. App. 3d 367, 374 (2004) (quoting *Santos*, 211 Ill. 2d at 416-17 (McMorrow, C.J., dissenting)). In order to avoid harassing or humiliating the complaining witness, "[m]inimally relevant evidence of prior sexual activity should not be admitted." *Id.* Indeed, evidence of the alleged victim's history "is not 'constitutionally required to be admitted' unless it would make a meaningful contribution to the fact-finding enterprise." *People v. Maxwell*, 2011 IL App (4th) 100434, ¶ 76 (quoting 725 ILCS 5/115-7(a) (West 2010)).

¶ 18    We will not disturb the trial court's ruling to bar evidence under the rape-shield statute unless the ruling was an abuse of discretion, "which 'occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court.' " *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42 (quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)). The trial court did not abuse its discretion here. The evidence in question was not so relevant that its admission was constitutionally required. Defendant admitted that he had sex with the victim. The theory of defense was that the sex was consensual. Defendant was allowed to elicit testimony that the spotting of blood that Sheehan observed could have been the result of rough sex or a lack of lubrication but did not necessarily signify a lack of consent. The relevance of the spotting of blood depends, then, on the jury inferring that it is less likely that rough sex is consensual. If the jury were to draw that inference, however, J.L.'s recent prior sexual activity would be relevant only to the extent that it was nonconsensual. In other words, to the extent that the spotting of blood showed that J.L. was sexually assaulted, evidence of a prior sexual encounter would not exonerate defendant unless the jury believed that the prior encounter

was a sexual assault. There is no evidence of that, however. We fail to see how the evidence defendant sought to admit would have made a meaningful contribution to the factfinding enterprise.

¶ 19    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 20    Affirmed.