2022 IL App (1st) 191968-U

FIFTH DIVISION

June 24, 2022

No. 1-19-1968

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7945 |
| | ) | |
| BULMARO MEJIA-MAYA, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the evidence at trial was sufficient to prove the defendant guilty beyond a reasonable doubt of home invasion and residential burglary—the felonies underlying two of his three felony murder convictions—the defendant received a fair sentencing hearing. Because there was only one victim, two of the defendant's convictions for felony murder are vacated.

¶ 2    Following a bench trial in the circuit court of Cook County, the defendant Bulmaro Mejia-Maya was found guilty of three counts of felony murder (720 ILCS 5/9-1(a)(3) (West 2016)) and sentenced to concurrent terms of natural life in prison. On appeal, the defendant contends that the State failed to prove he committed two of the three felonies underlying his convictions and,

therefore, he did not receive a fair sentencing hearing. In the alternative, he contends that where there was only one victim, his multiple murder convictions violate the one-act, one-crime doctrine. For the reasons that follow, we affirm the defendant's conviction and sentence for felony murder predicated upon aggravated criminal sexual assault (count IV); vacate the sentences imposed on the guilty findings for felony murder predicated upon home invasion (count III) and felony murder predicated upon residential burglary (count VI); and order that the mittimus be corrected accordingly.

BACKGROUND

¶ 3     The defendant's conviction arose from the April 2017 death of T.T. in Schaumburg, Illinois.[1] The State charged the defendant with 22 counts but subsequently *nol prossed* 14 counts. The case proceeded to a bench trial on eight charges: intentional murder (count I), strong probability murder (count II), felony murder predicated upon home invasion (count III), felony murder predicated upon aggravated criminal sexual assault (count IV), felony murder predicated upon residential burglary (count VI), aggravated criminal sexual assault alleging strangulation (count VIII), home invasion (count XIII), and residential burglary (count XXII). The following evidence was presented.

¶ 4     At trial, T.T.'s friend, Cheryl Gleason, testified that on the morning of April 16, 2017, she became concerned when T.T. did not show up at their church for choir rehearsal prior to Easter mass. After her calls and texts to T.T. went unanswered, Ms. Gleason went to T.T.'s apartment to

---

[1] We refer to victims of sex offenses by initials so as to protect their identity and/or privacy. *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 17 n.1.

check on her. T.T.'s car was outside but she did not answer the door, so Ms. Gleason called the police.

¶ 5     Schaumburg police officer Eric Stiefvater testified that he went to T.T.'s apartment to conduct a wellness check. After no one answered at the apartment's front door, he walked around to the north side of the apartment, where there was a patio and a sliding glass door. He noticed dried footprints on the patio. The sliding door was locked, so he walked around to the south side of the apartment, where there were two double-hung windows. The window on the right was "open in the up position a couple inches," and its screen, which was also "in the up position," had a cut in the lower portion.

¶ 6     Officer Stiefvater pushed the window all the way up and looked inside around the blinds. He saw muddy footprints "going from the window or towards the window" in "[b]oth directions" on the wood floor. He called out, and when no one answered, he climbed through the window into the apartment. After letting other responding officers in through the front door, Officer Stiefvater walked down a hallway and saw T.T. lying on the floor in a bedroom. Her right leg was on the bed, the frame of which was collapsed, and she "appeared to be deceased." A paramedic checked T.T. for a pulse and heartbeat and confirmed her death.

¶ 7     On cross-examination, Officer Stiefvater admitted that he could not say whether the muddy footprints on the patio were multidirectional. However, he reiterated that the muddy footprints inside the apartment were near the window and "appeared to be both directions." He did not notice muddy footprints anywhere else in the apartment but acknowledged that he "wasn't looking for more."

¶ 8    Javier Chinchilla, a former roommate and co-worker of the defendant, testified that on April 15, 2017, he drove the defendant home from work. Later that evening, Mr. Chinchilla and two other co-workers/roommates, Miguel Vega and Arturo Vega Herrera, left for an overnight, work-related trip. Around 1 a.m., Mr. Chinchilla received a phone call from the defendant, but did not answer. At approximately 3:30 a.m., as the group was driving back to Schaumburg, the defendant called again and Mr. Chinchilla answered. The defendant related that he had been smoking a cigarette on their balcony and saw T.T. walk by. He helped her carry groceries into her apartment and they both started undressing. Then, T.T. started "getting fussy and said no." The defendant "cracked her in the head" with a beer bottle, had sexual intercourse with her, and strangled her. The defendant told Mr. Chinchilla, "I f*** up" and "I killed the girl." Mr. Chinchilla told the defendant that he was crazy and his story did not sound real. He passed the phone to Mr. Vega Herrera.

¶ 9    Mr. Chinchilla returned to Schaumburg around 11 a.m. or 12 p.m. on April 16, 2017. He briefly saw the defendant at a job site and noticed scratches on his face. Mr. Chinchilla then went to their apartment. While he was there, the defendant called and asked him to retrieve his passport. Mr. Chinchilla refused to help or meet the defendant, even though the defendant called at least five times. At approximately 7:30 p.m., police officers came to the apartment. Mr. Chinchilla testified that he lied to the police because he was scared about his other roommates' immigration status. On April 18, 2017, police officers came to Mr. Chinchilla's work site and asked to speak with him at the police station. Once there, Mr. Chinchilla told the police "everything."

¶ 10    Arturo Vega Herrera testified through an interpreter that on April 16, 2017, he was with Mr. Chinchilla, on the way back to Schaumburg, when Mr. Chinchilla received a call from the

defendant around 3 or 3:30 a.m. At some point, Mr. Chinchilla handed the phone to him. During the ensuing conversation, the defendant told Mr. Vega Herrera, "I f*** up a girl." Mr. Vega Herrera told the defendant he was crazy and hung up. At approximately 11 a.m., Mr. Vega Herrera saw the defendant at a job site and noticed scratches on his face and hands. At some point that evening, police officers spoke to Mr. Vega Herrera at his apartment and, two days later, he spoke with officers at a police station. He did not tell them about his conversation with the defendant either time because he was scared of deportation.

¶ 11　Artemio Ramirez testified through an interpreter that he owned a drywall company in Florida with operations in several states, including Illinois. At 6:43 a.m. on April 16, 2017, he received a text message from the defendant, whom he employed at the drywall company, stating that he had "problems" and asking that Mr. Ramirez move him out of state. Mr. Ramirez called the defendant, who said, "I f*** up," and "I killed a girl." The defendant told Mr. Ramirez that when he helped his neighbor "bring up some stuff," she took one of his credit cards. He told Mr. Ramirez that they started fighting, she was defending herself, and he hit her over the head with a bottle. The defendant said that he tried to perform mouth-to-mouth resuscitation and asked Mr. Ramirez to move him to Florida, Utah, or Mexico. Mr. Ramirez told the defendant to "wait there." Later that day, the defendant told Mr. Ramirez over the phone that he was on his way to Florida. Two days later, Mr. Ramirez spoke with a Schaumburg police detective in Florida and told him where the defendant was located.

¶ 12　Hoffman Estates police sergeant Alvaro Fernandez testified that on April 18, 2017, when he was a detective, he was asked by the Schaumburg police department to assist them with interviews of Spanish-speaking subjects in a homicide investigation. Ultimately, Sergeant

Fernandez went to Florida to interview the defendant on April 20, 2017. Sergeant Fernandez *Mirandized* the defendant prior to conducting the interview, which was video recorded, translated, and played at trial.

¶ 13    An English-translated transcript of the interview was admitted into evidence. At the beginning of the interview, the defendant said he had been told he hit a woman, but he was not sure about that because he was drunk. When he was shown a photo of T.T., he stated that she lived close to his apartment and that he met her about a month prior, when they were both at a liquor store. On April 15, 2017, he went to a dance after work. When he came home around midnight, he saw T.T. taking something out of a car in the rain. The defendant told Sergeant Fernandez that he told T.T. he needed a beer, but that was all he could remember, as he was very drunk.

¶ 14    Upon further questioning, the defendant stated that he hit T.T. with his hand when they were inside her apartment. When Sergeant Fernandez asked the defendant how he got inside, he stated, "I rang the bell of the other neighbor and they opened but they didn't see it was me." He explained that once he was inside the building, he was able to enter T.T.'s apartment because she had left her front door open. Sergeant Fernandez stated that T.T.'s door was closed, and, in response, the defendant said, "When I came out and so nobody would see me there I didn't want to come out from there I came out through a window."

¶ 15    Sergeant Fernandez pointed out that police officers had found mud inside the apartment, on the floor by the window, and asked how that could have happened if the defendant had only *exited* the apartment through the window. The defendant replied, "Yes well I remember that I came out that way but like I say I was very drunk." When Sergeant Fernandez asked the defendant why he left through the window rather than the door, the defendant answered that he was afraid

someone would see him leaving. He reiterated that he "came out through the window" and said, "I don't know why I came out of there." Sergeant Fernandez asked the defendant if it would be strange for the police to find his fingerprints on the outside of the window. The defendant responded, "Yes well I don't know, if I—I opened there but I don't know but I—but I don't remember very well entering through there."

¶ 16    The defendant initially denied that he had fought with T.T. He also denied knowing how he got scratched. He said he left Schaumburg because he saw police and "thought this is serious so it's better if I leave maybe they won't find me or something."

¶ 17    Sergeant Fernandez asked the defendant where in the apartment he hit T.T. The defendant answered that T.T. was "coming out of the bathroom" and was naked. He reiterated that he entered the apartment through the front door, which was open. When asked for clarification, the defendant said the door was not locked. He stated that T.T. saw him as "she was just coming in," and they started talking. The defendant told T.T. he liked her, and T.T. told him to leave and that she was going to call the police. T.T. went into a bedroom and told the defendant she did not want to have sex with him. The defendant then hit T.T. twice. She fell to the floor and "wasn't reacting," so the defendant left.

¶ 18    Sergeant Fernandez asked the defendant how he was "controlling" T.T. since she had indicated she did not want to have sex with him. The defendant stated that T.T. "started to get all flailing and thrashing" and that he was on top of her, held her hands, hit her, and then grabbed her face. When Sergeant Fernandez asked the defendant if he grabbed T.T. by the neck, he answered, "I think so." The defendant agreed that T.T. was trying to get away, but he said "she didn't have

enough strength to do that." He told Sergeant Fernandez that because he was drunk, he did not know if he "finished" when he had sex with T.T. He also said, "I thought maybe she died."

¶ 19    After a break, Sergeant Fernandez told the defendant they would "start again" and asked him to explain what happened from the time he saw T.T. at her car. The defendant related that he was outside his apartment building, saw T.T. leave her building and go to her car, and talked to her. Then, "like an hour later," he entered T.T.'s building and apartment through the building's and the apartment's front doors. With regard to the door to the apartment, he reiterated that "that door was opened I remember that I came inside through there." When Sergeant Fernandez asked the defendant if he was sure the door was open, he answered, "I am not very sure but yes I entered through there." The defendant said that he took his shoes off at this point. Sergeant Fernandez asked him why he did so, and the defendant answered, "Well so I didn't make any noise." He also stated, "I thought I am going to take them off to get inside like that."

¶ 20    Sergeant Fernandez asked the defendant what his intention was when he entered the apartment. The defendant responded as follows:

> "No well I was just going to like to just to tell her that I like her and all that but I saw that she started being, she didn't take anything but she uh—ran and that's when I told her I am not going to do anything to you and she said no, and when she screamed that's when I started uh—I was trying to hold her."

The defendant said he threw T.T. on the bed, she screamed once, he told her to shut up, and "that's when I started like covering her mouth and all that but that's all I remember." The defendant related that he had sex with T.T., hit her, and then, when she fell, he "just got out of there because I didn't want them to find me here or something so I went out." He denied strangling T.T.

¶ 21    Sergeant Fernandez testified that he showed the defendant photos of T.T.'s apartment. The defendant circled a window on one photo and stated that he left the apartment through it. On cross-examination, Sergeant Fernandez denied that, during the interview, the defendant said he carried some groceries or bags into the apartment for T.T. Rather, the defendant related that he had asked T.T. if he could help her bring in some groceries.

¶ 22    Lynette Johns, a forensic technician with the Schaumburg police department, testified that she and her fellow forensic technician, Thomas Todd, processed T.T.'s apartment on April 16, 2017. Ms. Johns took photos of the scene, including photos of T.T., who was lying on her back on the bedroom floor, between the bed and a broken bed rail. T.T. was wearing nothing but a t-shirt that was "pushed above her breasts." Ms. Johns did not see any beer bottles in the apartment.

¶ 23    Thomas Todd testified that after the scene was photographed, he looked for fingerprints. The open window in the living room appeared to have "finger marks" on it, so Mr. Todd removed the window from the frame and collected it as evidence. Mr. Todd noted that there were footprints "from the living room leading towards the hallway, and there was [*sic*] also muddy footprints with not a lot of detail leading from the window." He processed the footprints with fingerprint and black powder and made gel lifts from them. At the police station the next day, he processed the fingerprints and palmprints on the interior and exterior of the window. On April 27, 2017, he took the defendant's fingerprints, palmprints, and footprints while the defendant was in custody.

¶ 24    Charles Schauer, an independent latent fingerprint expert, testified that he analyzed fingerprints, palmprints, and footprints that were provided to him by the Schaumburg police department. He determined that the fingerprints, a partial palm print, and footprints found at the scene matched the defendant.

¶ 25    The parties stipulated that an evidence technician collected a buccal swab from the defendant that was sent to the Illinois State Police Crime Laboratory for testing and analysis.

¶ 26    Jennifer Belna, a forensic scientist and DNA expert with the Illinois State Police, testified that she analyzed swabs that were collected from T.T.'s body at the medical examiner's office. She identified semen on the vaginal and anal swabs and determined that a male DNA profile identified from those swabs matched the defendant's DNA profile.

¶ 27    Dr. Adrienne Segovia, the medical examiner who performed T.T.'s autopsy, testified that T.T. died as the result of strangulation and that the manner of death was homicide. Dr. Segovia based this finding on the presence of "petechiae and hemorrhage in the eyes" and a "neck muscle hemorrhage." Dr. Segovia also noted numerous abrasions, lacerations, and bruises on T.T.'s face and body, including her genital area.

¶ 28    The defendant made a motion for a directed finding, which the trial court denied. The defendant did not testify or present any evidence.

¶ 29    Following closing arguments, the trial court found the defendant guilty on all counts: intentional murder (count I); strong probability murder (count II); felony murder predicated upon home invasion (count III); felony murder predicated upon aggravated criminal sexual assault (count IV); felony murder predicated upon residential burglary (count VI); aggravated criminal sexual assault alleging strangulation (count VIII); home invasion (count XIII); and residential burglary (count XXII).

¶ 30    In announcing its ruling, the court stated that it believed the defendant "planned to rape" T.T. and, when she fought back, murdered her. The court characterized the defendant's actions as brutal and barbaric. It further stated it was shocked and appalled at some of the evidence presented,

especially the photographs, which it said "speak for themselves about the brutality of what [T.T.] went through and the rape that was forced upon her."

¶ 31    The trial court stated it did not believe T.T. invited the defendant into her residence. Rather, it found that the defendant's entry "was clearly without consent" from T.T. The court indicated that although it could not determine whether the defendant entered T.T.'s apartment through her front door or a window, "it does not matter because he was not invited in." The court then stated, "[E]ven if he forms an intent, once he was in there, which as I stated, I do not believe, that is still sufficient evidence for home invasion and residential burglary once he enters and forms the intent while in the residence. But, again, that's not what this Court believes." The trial court concluded that the evidence against the defendant was "simply overwhelming" and that there was no question about his guilt.

¶ 32    The defendant filed a posttrial motion, which the trial court denied.

¶ 33    Following a sentencing hearing, the trial court imposed concurrent sentences of natural life imprisonment for felony murder predicated upon home invasion (count III), felony murder predicated upon aggravated criminal sexual assault (count IV), and felony murder predicated upon residential burglary (count VI). The court merged the remaining counts. The defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed

¶ 34                                    ANALYSIS

¶ 35    We note that we have jurisdiction to consider this matter as the defendant filed a timely notice of appeal.  Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 36    On appeal, the defendant contends that the State failed to prove he committed two of the three felonies underlying his convictions for felony murder—home invasion and residential

burglary—and, therefore, he did not receive a fair sentencing hearing. Specifically, he argues that the State did not prove he entered T.T.'s apartment without authority, which is an essential element of both residential burglary and home invasion as charged, and that the State failed to prove he had felonious intent at the time he entered, which is an essential element of residential burglary.

¶ 37    The defendant asserts that "it is clear that the trial court did not understand the requisite showings required for a home invasion or residential burglary conviction," as it "incorrectly asserted in [its] finding of guilt that convictions could be secured for home invasion and residential burglary if [the defendant] entered the house with permission and for innocent purposes and formed felonious intent while inside the residence." As such, the defendant argues that this court should reverse his convictions for felony murder predicated upon home invasion and residential burglary.

¶ 38    Further, he contends that, because his natural life sentence was based on two crimes that were not proven at trial and were not understood by the trial court, and because it is likely the trial court would not have chosen to impose a life sentence based on a single count of felony murder (that is, the count predicated upon aggravated criminal sexual assault), the cause should be remanded for a new sentencing hearing.

¶ 39    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). This standard of review applies regardless of whether evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). All reasonable inferences

from the evidence must be drawn in favor of the State. *People v. Hardman*, 2017 IL 121453, ¶ 37. The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 40    "A person commits residential burglary when he or she knowingly and without authority enters *** the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2016). And, "A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present" and "[i]ntentionally causes any injury *** to any person or persons within the dwelling place." 720 ILCS 5/19-6(a)(2) (West 2016).

¶ 41    The defendant's challenge in this court focuses solely on whether the State proved he entered T.T.'s apartment "without authority," an element common to *both* residential burglary and home invasion as charged, and whether the State proved he had "the intent to commit therein a felony" at the time of entry, an element exclusive to residential burglary as charged. We address these elements in turn.

¶ 42    A defendant enters the dwelling place of another "without authority" when the occupant has not granted him consent to enter. *People v. Witherspoon*, 2019 IL 123092, ¶¶ 25-26; see also *People v. Hudson*, 113 Ill. App. 3d 1041, 1045 (1983) ("without authority" has the same meaning

under the burglary and home invasion statutes). The defendant argues that he entered T.T.'s apartment *with* authority because she consented to having him bring groceries or other items inside.

¶ 43     After reviewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have concluded that the defendant entered T.T.'s apartment without authority. Although Mr. Chinchilla and Mr. Ramirez related what the defendant told them over the phone, that he entered T.T.'s apartment because she consented to having him bring items inside, this is not the scenario the defendant himself described when he was interviewed by Sergeant Fernandez. The defendant told Sergeant Fernandez that he rang the bell of one of T.T.'s neighbors, who opened the apartment building's common door but did not see him. He entered T.T.'s apartment through her unlocked front door and took his shoes off so that he would not make noise. He then happened upon T.T. when she was coming out of her bathroom, naked. He told her he liked her, and, in response, she told him to leave and that she was going to call the police. A third scenario—that the defendant entered through a window—was suggested by the physical evidence, as a responding officer found a window partially open, and both the officer and a forensic technician described the muddy footprints on the wood floor inside the window as including tracks leading away from the window.

¶ 44     The trial court rejected the defense theory of consensual entry, stating, "This Court does not believe for a minute that [T.T.] invited [ ] the defendant into her residence for one second. That is totally made up," and "This was clearly without consent." While the trial court stated it could not determine whether the defendant entered the apartment through the door or the window, it nonetheless found "it does not matter because he was not invited in." In essence, the trial court chose to believe the physical evidence and the statement the defendant gave to Sergeant Fernandez

over the statements he made to his coworker and employer. This was its prerogative in its role as the trier of fact. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 52. The evidence that the defendant was "without authority" to enter T.T.'s residence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *Slim*, 127 Ill. 2d at 307. Accordingly, the defendant's challenge to the sufficiency of the evidence of this element of residential burglary and home invasion fails.

¶ 45    The second element the defendant challenges is whether, at the time of his entry into T.T.'s apartment, he had "the intent to commit therein a felony." In the context of residential burglary, criminal intent is a state of mind that is usually inferred from surrounding circumstances. *People v. Maggette*, 195 Ill. 2d 336, 354 (2001). Such circumstances include the time, place, and manner of entry into the residence; the defendant's activity within the residence; and any alternative explanations offered for his presence. *Id.* Whether the requisite intent existed is a question within the province of the trier of fact, and such a determination will not be disturbed on review unless a reasonable doubt exists as to the defendant's guilt. *Id.*

¶ 46    The defendant argues that he entered T.T.'s apartment with innocent intent, as his intent at that point in time was either to help a neighbor carry groceries or other items inside, or to tell T.T. that he liked her. The trial court rejected these theories, stating, "It is the Court's belief that the defendant planned to rape [T.T.]." We cannot find this conclusion unreasonable.

¶ 47    Reviewing the evidence in the light most favorable to the prosecution, we find that given the surrounding circumstances, any rational trier of fact could have found that the defendant had felonious intent at the time he entered T.T.'s residence. See *id.* In his statement to Sergeant Fernandez, the defendant related, that about an hour after midnight, he went to T.T.'s apartment,

knowing she was home. He buzzed one of her neighbors for entry to the building, entered the unlocked front door of her apartment, and took off his shoes so that he would not make any noise. When T.T. emerged naked from her bathroom, she told him to leave and that she was going to call the police. The defendant then proceeded to hit her, throw her on a bed, restrain her, cover her mouth, and sexually assault her. Although he denied strangling T.T., the medical examiner determined that T.T. died as the result of strangulation. Moreover, the State presented evidence that the defendant may have entered the apartment through a window. Ample evidence was produced at trial to support the trial court's finding of felonious intent. As such, we reject the defendant's argument that the evidence was insufficient to prove he entered T.T.'s apartment with the intent to commit a felony.

¶ 48 We are mindful of the defendant's argument that the trial court did not understand the requisite showings required for a home invasion or residential burglary conviction. The defendant bases his argument on the following statement made by the trial court after it found that the defendant "planned to rape" T.T. when he entered her apartment:

"This Court does not believe for a minute that [T.T.] invited [ ] the defendant into her residence for one second. That is totally made up. The Court can't determine whether or not the defendant came through the door or the window; however, it does not matter because he was not invited in. The Court does not believe he was invited in. The defendant either walked through the door, as he said, or he came through the window against the victim's wishes, and he is an uninvited guest. And even if he forms an intent, once he was in there, which as I stated, I do not believe, that is still sufficient evidence for home invasion

and residential burglary once he enters and forms the intent while in the residence. But, again, that's not what this Court believes."

The defendant argues that "the above statement indicates that the trial court found that, probably, [the defendant] had felonious intent upon entry, but, perhaps, formed the requisite intent after he had entered innocently and with permission." The defendant maintains that the court's statement shows its findings of guilt were "colored by a misunderstanding of the law" and, therefore, should be reversed.

¶ 49    We cannot agree with the defendant's interpretation of the trial court's findings. The court found that when the defendant entered T.T.'s apartment, he "planned to rape" her. The court did not find that the defendant probably had this intent at that moment but perhaps formed it afterwards. In fact, in the excerpt quoted above, the trial court explicitly stated *twice* that it did not believe the defendant formed his intent *after* he had entered T.T.'s apartment. We find no ambiguity in the trial court's language and, in turn, no reason to reverse its guilty findings.

¶ 50    In a related argument, the defendant contends that he did not receive a fair sentencing hearing. He asserts that his natural life sentence was influenced by guilty findings for two crimes (felony murder predicated upon residential burglary and felony murder predicated upon home invasion) that were not proven at trial and were not understood by the trial court. He argues that, because it is likely the trial court would not have chosen to impose a life sentence based on a single count of felony murder (namely, the count predicated upon aggravated criminal sexual assault), this court should remand the case for a new sentencing hearing. We have already determined that the evidence at trial was sufficient to prove the defendant guilty beyond a reasonable doubt of

residential burglary and home invasion. Because the defendant's contention necessarily depends on the reversal of the trial court's findings of guilt on those charges, it lacks merit and we reject it.

¶ 51     Finally, the defendant contends that where there was only one victim, his multiple murder convictions violate the one-act, one-crime doctrine, and this court should remand for a determination of which single conviction should be entered. The State concedes that only one murder conviction may stand, but argues that because the conviction for felony murder predicated upon aggravated criminal sexual assault is the most serious offense, this court may modify the mittimus without remanding to the trial court.

¶ 52     Although the defendant failed to preserve this issue by objecting at trial and addressing it in a posttrial motion, one-act, one-crime violations are recognized under the second prong of the plain error rule. *People v. Smith*, 2019 IL 123901, ¶ 14; *People v. Harvey*, 211 Ill. 2d 368, 389 (2004) ("an alleged one-act, one-crime violation and the potential for a surplus conviction and sentence affects the integrity of the judicial process, thus satisfying the second prong of the plain error rule"). We therefore will review this issue. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005) (the plain error doctrine allows a reviewing court to consider a forfeited issue where the error is so serious that the defendant was denied a substantial right).

¶ 53     We agree with the parties that only one murder conviction may stand in this case. Where one person has been murdered, there can be only *one* murder conviction. *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001). "When multiple murder convictions have been entered for the same act, only the conviction for the most culpable charge of murder will be upheld, and the convictions on the less culpable charges of murder must be vacated." *Id.* When deciding which among multiple counts of felony murder is the most serious, it is logical to compare the punishments available for each of

the predicate felonies. *People v. Brown*, 2015 IL App (1st) 134049, ¶ 57. If it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded to the trial court for that determination. *People v. Artis*, 232 Ill. 2d 156, 177 (2009).

¶ 54    Here, the defendant was convicted of felony murder predicated upon home invasion (count III, predicated upon count XIII), felony murder predicated upon aggravated criminal sexual assault (count IV, predicated upon count VIII), and felony murder predicated upon residential burglary (count VI, predicated upon count XXII). As charged, home invasion is a Class X felony (720 ILCS 5/19-6(c) (West 2016)), aggravated criminal sexual assault is a Class X felony (720 ILCS 5/11-1.30(d)(1) (West 2016)), and residential burglary is a Class 1 felony (720 ILCS 5/19-3(b) (West 2016)).

¶ 55    The parties agree that the sentence predicated upon residential burglary must be vacated because a Class 1 felony is less serious than a Class X felony. However, they disagree as to whether this court may determine which of the two Class X felonies at issue here is more serious, or whether we must remand the case to the trial court for that determination.

¶ 56    The State asserts that aggravated criminal sexual assault is more serious because it always triggers consecutive sentences (see 730 ILCS 5/5-8-4(d)(2) (West 2016)), its sentences must always be served at 85% (see 730 ILCS 5/3-6-3(a)(2)(ii) (West 2016)), and it mandates registration as a sexual predator for life (see 730 ILCS 150/2(E), 7 (West 2016)), while home invasion triggers consecutive sentences only where the defendant inflicted severe bodily injury (see 730 ILCS 5/5-8-4(d)(1) (West 2016)), triggers the 85% requirement only where the defendant inflicted great bodily harm (see 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016)), and requires no type of registration. In

his reply brief, the defendant argues that in evaluating seriousness, we must consider home invasion as it was charged in this case, rather than all of the possible ways home invasion could have been charged. Based on the extent of the harm inflicted on T.T., the defendant asserts that in his case, home invasion would have triggered consecutive sentences and the 85% requirement and, therefore, is equally as serious as aggravated criminal sexual assault.

¶ 57 The defendant has no answer for the State's assertion that aggravated criminal sexual assault is more serious than home invasion because it mandates registration as a sexual predator for life, while home invasion carries no type of registration requirement. We find the State's argument persuasive. Consequently, we find that the most serious of the defendant's three felony murder convictions is count IV, the count predicated upon aggravated criminal sexual assault. Because residential burglary and home invasion are less serious offenses than aggravated criminal sexual assault, the defendant's convictions on counts III and VI must be vacated. See *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 27.

¶ 58 The trial court's guilty findings on counts I, II, III, VI, VIII, XIII, and XXII will merge with the conviction entered on count IV. See 730 ILCS 5/5-1-12 (West 2016) (a conviction requires both a finding of guilt and a sentence); *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007) (where multiple convictions violated the one act, one crime rule, this court ordered correction of the mittimus to reflect a single conviction and merged the other counts). We order that the mittimus be corrected to reflect a conviction and sentence on only count IV.

¶ 59 CONCLUSION

¶ 60 For the reasons explained above, we affirm the defendant's conviction and sentence for felony murder predicated upon aggravated criminal sexual assault (count IV). We vacate the

sentences imposed for felony murder predicated upon home invasion (count III) and felony murder predicated upon residential burglary (count VI). We order that the mittimus be corrected accordingly.

¶ 61    Affirmed in part, vacated in part; mittimus corrected.