2024 IL App (2d) 230043
No. 2-23-0043
Opinion filed May 13, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-222 |
| | ) | |
| DOUGLAS J. MOELLER, | ) | Honorable |
| | ) | Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices Hutchinson and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, the circuit court found defendant, Douglas J. Moeller, guilty of nonconsensual dissemination of private sexual images in violation of section 11-23.5 of the Criminal Code of 2012 (Code) (720 ILCS 5/11-23.5 (West 2016)). The court specifically found that the illegally disseminated photograph (subject image or subject photograph) contained an image depicting "bondage" under the statute. Pursuant to the parties' sentencing agreement, which the court accepted, defendant was sentenced to conditional discharge. On appeal, he argues that (1) the State failed to prove beyond a reasonable doubt that the subject image depicted the victim,

M.A.,[1] engaged in a "sexual act" as defined by the statute; (2) the statutory definition of bondage as sexual activity under section 11-23.5(a)(4) is unconstitutionally vague on its face; (3) he was denied his right to a fair trial when the court precluded him from accessing the person who photographed the subject image; and (4) the supreme court's decision in *People v. Austin*, 2019 IL 123910, which held that the statute is subject to an intermediate level of scrutiny under first amendment constitutional protections, should be reversed. We affirm defendant's conviction and sentence.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant formerly served as the superintendent of the DeKalb public school district. He was M.A.'s supervisor when she was employed as a principal at one of the schools in the district. As their relationship developed, defendant requested sexually suggestive photographs of M.A. Eventually, she sent him the subject image, along with two other photographs, rationalizing that her compliance would prevent further requests.

¶ 4     Within a few months, the nature of their relationship had changed, and M.A. had filed a complaint against defendant to the school board regarding his increasingly aggressive behavior. The school board and defendant entered into an agreement that he be placed on leave while the

---

[1]As a preliminary matter, we note that defendant continuously referred to M.A. by her full name in his opening brief. It is the practice of this court to refer to victims of sex offenses by initials, so as to protect their privacy. See *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1. Though not prohibited, we have long disapproved of using a victim's full name, and we have consistently admonished parties to discontinue this improper practice. *Id.*; *People v. Leggans*, 253 Ill. App. 3d 724, 727 (1993).

matter was investigated. Ultimately, defendant accepted a retirement settlement with the school board on February 7, 2017.

¶ 5    The following day, four school board members received a text message from an unidentified phone number that contained three photographs of M.A., including the subject image, which depicted M.A. from behind, wearing a bra and thong underwear, with her arms outstretched to each side and her wrists held up by fabric loops extending downward from a curtain rod. In addition to the attached photographs of M.A., the text message stated, "Hey board members. Here are three of five pictures of [M.A.] sent to me by another parent. I didn't send the other two because they are pornographic pictures of [M.A.] and I don't want to distribute pornography." The text message also stated that "M.A. is very vindictive [and] will retaliate against [defendant] if she finds out I sent these pictures to you."

¶ 6    On June 8, 2018, a grand jury indicted defendant on one count of nonconsensual dissemination of private sexual images, a Class 4 felony. 720 ILCS 5/11-23.5(a), (f) (West 2016). The indictment alleged that defendant intentionally disseminated an image of M.A. engaged in a sexual act as defined by the statute, and that he obtained the image under circumstances in which a reasonable person would understand that it was to remain private and that he should have known M.A. had not consented to its dissemination. During a pretrial hearing, the State specified the nature of the alleged "sexual activity" as "[b]ondage and fettering," noting that M.A.'s "arms are bound" in the subject image. See *id.* § 11-23.5(a)(4).

¶ 7                                    A. Pretrial Motions

¶ 8    Defendant filed numerous pretrial motions, including a motion to compel discovery, on November 3, 2021. The motion alleged, among other things, that when interviewed by law enforcement during the investigation of this case, M.A. indicated that the subject image was

captured by a male friend at a hotel in Chicago and that it had been shared only with defendant. In the motion, defendant requested the identity of the individual who took the photograph "in anticipation of calling him as a witness at trial to testify concerning the facts and circumstances surrounding the taking of these photographs and the purpose of their creation."

¶ 9　Further, defendant stated that he intended "to cross examine [M.A.] as to the intent of her having these photographs taken of herself and the purpose of their creation." Defendant argued that both of these witnesses "are relevant to the issues of whether [M.A.] intended these images to remain private and whether she intended them to be disseminated, both factual questions to be determined by a jury." Defendant also requested that the identity of the individual who took the subject photograph be revealed because M.A. alleged in her civil lawsuit against defendant that "some of these photographs in the case herein had been doctored" to appear sexual in nature. Defendant also alleged that the State denied his request to disclose the identity of the individual who took the subject photograph.

¶ 10　The circuit court conducted a hearing on defendant's motion to compel, on November 30, 2021. Defense counsel informed the court that he had a conversation with the assistant state's attorney assigned to the case. She told defense counsel that M.A. claimed "she does not know the identity of the individual that took the photograph." Defense counsel requested additional time to determine how to proceed further on the issue, considering that the State did not have information regarding the identity of the individual who took the photographs. The court asked the assistant state's attorney whether M.A. knew the identity of the individual who took the photographs, and the State responded, "[s]he doesn't know the name." A written order entered on the same date continuing the case stated, "Victim has indicated she does not know the name of the person who took the picture."

¶ 11 On March 29, 2022, defendant filed a motion *in limine* entitled "Impeachment of [M.A.]." The motion stated that he intended to question M.A. regarding her civil complaint against him, including the allegation that one or more of the photographs defendant texted to school board members "had been doctored to make them appear to be sexual in nature but the original photograph was not sexual in nature." Defendant questioned the authenticity of the photographs. According to defendant, M.A.'s civil pleading alleging the doctoring of the photographs was "relevant to the issue of whether the photographs depict a sexual act" as defined by section 11-23.5 of the Code. He also argued that M.A.'s refusal to allow the investigator retained by the school board to examine the contents of her cell phone was relevant to the nature of the relationship between her and defendant and the context in which she sent the photographs to defendant. Defendant's motion *in limine* did not mention a request to question M.A. regarding the identity of the individual who took the subject photograph.

¶ 12 On April 4, 2022, defendant filed a second motion *in limine*, also entitled "Impeachment of [M.A.]." Defendant stated that he intended to question M.A. during cross-examination "about the individual who allegedly took the photographs that form the basis of the charge contained in the indictment" for impeachment purposes. The motion described an interview between DeKalb Police Department Detective Sadie Pristave and M.A. as follows:

" '[M.A.] told me she remembered when the pictures were taken with her cell phone. She advised the summer prior, she went to Chicago with a male friend of hers and when they were in the hotel, he took the photo where she is in her underwear and her hands in straps. She advised that she sent that picture to [defendant] and no one else. She advised the other pictures were of the same trip to Chicago, and she sent those to [defendant] as well.' "

¶ 13    Defendant also included in his motion quoted dialogue from a text conversation between defendant and M.A. from September 5, 2016, that was recovered from M.A.'s cell phone during the police investigation, which states in relevant part as follows:

" 'I sent you those photos because you asked for some of me and alluded to wanting provocative ones. Not sure how I could pull that off myself. Didn't realize it would stick with you who took them more than my sharing me with you. Yes, a male friend, an ex-boyfriend with whom I still see on occasion. We have known each other, including the time we officially dated, for nine years now. I consider him one of my very best friends and he says the same of me.' "

¶ 14    Defendant argued in his second motion *in limine* that he had a right to investigate the photographs that serve as the basis of the indictment against him. He alleged that the discovery documents provided to him at that point contained no mention of whether the DeKalb Police Department attempted to determine the identity of the individual who took the photographs of M.A. Defendant also noted that he had previously filed, on November 3, 2021, a motion to compel the identification of the individual who took the photographs. The assistant state's attorney then assigned to the case told the circuit court that she did not know the name of the individual who took the photographs. Defendant alleged that M.A. was thwarting the investigation of his case by refusing to disclose the identity of the individual who took the photographs. He argued that

"[i]nconsistent statements by her related to the identity of the individual who took the photographs are relevant to her credibility as a witness, the authenticity of the photographs, the nature and context of the photographs, whether the photographs were intended to remain private, and whether they were intended for dissemination."

¶ 15 On April 21, 2022, the circuit court conducted a hearing on defendant's motions *in limine*. The court granted defendant's first motion *in limine*, allowing him to question M.A. regarding the pending civil complaint filed against him. As to the allegation of a doctored photograph, the State clarified that the subject image which formed the basis for the indictment was not one of the photographs M.A. claimed had been doctored. The court also ruled that defendant would be allowed to question M.A. regarding whether the images were doctored "with the caveat that we're not trying the other two photographs, we're trying the photograph in the file," referring to the subject image in which M.A.'s wrists were allegedly constrained by loops of fabric extending down from a curtain rod. In addition, over the State's objection, the court granted defendant limited questioning of M.A. regarding her refusal to provide the school board's investigator with the contents of her cell phone.

¶ 16 Next, the circuit court considered defendant's second motion *in limine* to question M.A. regarding the identity of the individual who took the photographs. The court reminded the State that, in a previous hearing, the assistant state's attorney informed the court that M.A. did not know the name of the individual who took the photographs. The State responded that it gave "some additional information to [defense counsel] since that time. It is not a name, but some additional information about who that individual is."

¶ 17 During a lengthy colloquy with the parties, the circuit court stated that it was concerned that M.A. would testify and claim that for nine years, she had dated the individual who had taken the subject photograph but did not recall the individual's name. The State responded that M.A. would testify that defendant's behavior made her feel uncomfortable and that she provided him with the explanation regarding an ex-boyfriend because she believed that it would lessen defendant's jealousy. The State told the court that M.A. would testify that she does not know the

individual's name who took the subject photograph. Defense counsel next stated, "[j]ust to make the record clear, I'm not making any aspersion on the State, Judge." He stated that he was deeply troubled that "the photograph that's at the heart of this trial, the complaining witness is saying I don't know who took it, especially considering the nature of the photograph." The court then told defense counsel that he would "have fertile grounds for cross-examination," and defense counsel responded affirmatively. The court entered the second motion *in limine* and continued it for trial, indicating that the issue could be readdressed if necessary.

¶ 18 On May 5, 2022, the circuit court conducted a final pretrial hearing, during which defendant waived his right to a jury trial. Thereafter, the court addressed all outstanding motions, including the second motion to dismiss and a motion to define the word "disseminate," which had yet to be heard. The court asked defense counsel, "[a]re you withdrawing any other—all pretrial motions that have not been litigated?" Defense counsel responded that, after conferring with defendant and reviewing the motions, he moved to withdraw both. The court scheduled the trial and asked whether there were any other matters that needed to be discussed. Both parties answered "no."

¶ 19                                    B. Trial

¶ 20                              1. Testimony of M.A.

¶ 21 A bench trial commenced on October 5, 2022. After opening statements, M.A. testified that she initially had worked as a teacher and, after completing her secondary degree, began working in school administration at a public school in Elgin, where she met defendant. She then identified defendant in court. M.A. testified that at the Elgin school, she served as the department chair for English while defendant served as the department chair for special education and as a dean. M.A. and defendant were colleagues for two years. She recalled a couple of occasions when

she spent time with defendant in a group setting outside of work, including a cookout at her house and meeting for drinks after work on a Friday. After working in Elgin, she served as a department chair at a public school in La Grange. She stated that she did not stay in contact with defendant "for quite a while" after she left employment at the school in Elgin.

¶ 22    M.A. recalled that within a couple of years, defendant had contacted her because he became the principal at a public school in DeKalb, "and he invited me out." M.A. stated that defendant was very proud of attaining the position and wanted to show her the construction for the new school. M.A. joined defendant to see the new school and then lost touch with him for a number of years.

¶ 23    M.A. described how she had been both the assistant principal for curriculum and instruction and the interim principal at a public school in Bolingbrook. In 2016, her then-supervisor informed her that there was a meeting of school superintendents, that he met defendant at the meeting, and that defendant had asked about M.A. At that point, defendant was the superintendent of the DeKalb public school district.

¶ 24    At the next meeting of school superintendents, defendant continued to ask M.A.'s supervisor about her job and how she was doing as an interim principal. Defendant then contacted M.A. in the spring of 2016 to inform her of a principal position opening at one of the schools in DeKalb. The State asked M.A., "[i]s it fair to say that you felt as if the defendant was recruiting you to apply for that position?" She responded affirmatively, stating that she had not been seeking a position and had not applied for any job openings. Defendant told M.A. that, if she was interested in the position, it would be hers, although she would have to complete the interview process like any job candidate.

¶ 25    Ultimately, M.A. applied for and was accepted to the position of principal at one of the DeKalb public schools in April 2016. She described the nature of her relationship with defendant during the application process. She stated that he was the only individual with whom she had communicated about the application process and that he was the only person who had provided her with information and feedback. M.A. stated that defendant informed her that she "was head and shoulders above the other candidates that they had *** been looking at" and that "[h]e was very encouraging in terms of [her] background and [her] personality and how he felt [she] would get along with all community members and the various groups that [she] would be dealing with in that position as principal." She characterized her relationship with defendant at that time as professional and friendly.

¶ 26    After M.A. began her employment as the principal at one of the DeKalb schools, she still characterized her relationship with defendant as professional and friendly. However, she stated:

> "there [were] also text exchanges that I would describe as, you know, maybe
> flirtatious but also just kind of teasing and fun and, you know, we shared a lot of
> information about like our vacations and things that we did in our personal lives as
> well so, and at that point he also had been stopping over at my house a number of
> times on his motorcycle."

She agreed that her relationship with defendant at that point was "somewhat flirtatious."

¶ 27    In July 2016, defendant asked M.A. to go to dinner with him to celebrate her attaining the principal position. She described her interactions and relationship with defendant after the dinner as "kind of maybe evolved a little bit more into more of the flirting." She stated that most of the communication still occurred through text messages, but "there was a lot of sharing of our feelings of, you know, if things were different, you know, what we would like our relationship to have been

like and some of the kind of maybe fantasy or fantastical elements of our relationship." M.A. clarified that she and defendant were never at any point in time having a "dating relationship." She also stated that she and defendant had never engaged in a sexual relationship. She further clarified the numerous communications she had with defendant by text message:

"I would say that was our kind of primary mode of the most frequent conversation—or communication that we had, and it could start off as innocently as, 'Oh, I went here for the weekend' and then, you know, for example, he would talk about these great experiences he had and he wished I had been there with him, and if I did something, you know, he would comment how he wished he could have been there with me and doing it with me, or even at a point where I would share with him that I had gone on a date or whatever and he would communicate with me that like, for example, he'd be lying if he didn't admit that he wished that he had been the one with me instead of the person with whom I was on a date."

¶ 28 M.A. testified that, "probably sometime in July," after the dinner, defendant requested that she send him photographs. She stated that his requests increased over time:

"I know they definitely picked up at that point because when he dropped me off that night, [he] came in for a while, he had hung his jacket on the back of a chair in my front room and ended up forgetting it there or leaving it there, and a number of times when we were speaking together he would make references to, 'Oh, you should just keep the jacket because you could have some'—you know, 'you could send some really interesting pictures of yourself in that for me' or 'I could see some really sexy things coming from you in that jacket.' There were a number of

references that he would verbally make to me about wanting some sort of photograph of me that was compromising."

¶ 29 M.A. acknowledged that defendant made the requests for sexually explicit photographs "almost exclusively" in person and "maybe once or twice in a phone call." She stated that defendant made these requests "at least five or six times," as to what she considered "strong comments indicating that that was his desire." M.A. stated that, based on defendant's "strong comments," she eventually sent photographs to him. She had tried to return defendant's jacket at one point, but he refused to accept it, instead stating that she should keep it so that she "could take a specific photograph with it." M.A. testified that she was "getting very uncomfortable about it and feeling very pressured by that."

¶ 30 M.A. described that she had previously exchanged innocent photographs with defendant of vacations and family events. However, after her celebratory dinner with defendant, she further explained:

"The reason that I know that I sent [the subject photograph] is because I felt like this was his expectation of me that wasn't going away and unless I sent something that would maybe satisfy him that he wouldn't stop making those requests of me, and so I felt like—it's not like I had this collection of photos of me and it was one that I had that I thought, although it depicted bondage, it still—you know, my face was not facing the camera. I still had some level of clothing on, so on some level I felt it was still kind of safe and that maybe it would satiate his requests of me."

¶ 31 The State asked M.A. whether the subject image "depicted bondage," in that she felt the picture was "of a more sexual nature that you sent to the defendant?" M.A. responded, "yes."

¶ 32    The State presented without objection exhibits 1 and 2 for admission, which were two photographs of M.A. She described exhibit 1 as depicting her in a dress while she was in downtown Chicago and exhibit 2 as depicting "the same kind of trip downtown in the photo that was of bondage, the one that I sent him that I was hoping would pacify him."

¶ 33    M.A. testified that the photographs were taken "sometime that summer of 2016" on her cell phone. Defendant did not take the photographs of M.A. She stated that State's exhibits 1 and 2 accurately depicted the photographs that she sent to defendant by text message near the end of July 2016.

¶ 34    The State next asked M.A. to explain what she meant when she testified earlier that the photograph in State's exhibit 2 depicted bondage. M.A. stated that "there are straps that are hanging and there are large loops hanging from those straps, and my arms are kind of tied or hung up in the loops of the straps." She clarified that the straps were hanging from curtains in the room. M.A. testified that she knew that exhibit 2 depicted herself in the photograph because it showed a tattoo on the bottom of her back and she still had the image stored on her cell phone.

¶ 35    In August 2016, the nature of M.A.'s relationship with defendant began to change. When M.A. told defendant that she was going on a date or had been on a date, defendant "seemed to get really aggravated with [her] and retaliate. He would demand that [she] would meet him and have a meeting with him immediately after." She stated that defendant's "tone completely changed with [her], and he seemed to maybe find a way to admonish [her] in some regard after that, so [she] started to kind of see that pattern emerge."

¶ 36    During the middle of August 2016, M.A. had a conversation with defendant in which she expressed her preference that her relationship with him remain professional. She acknowledged that she began to back away from the flirtatious relationship she had with defendant.

¶ 37    The State next presented State's exhibit 3, which was a text message from defendant that she had received on July 29, 2016. The exhibit was admitted without objection. M.A. described the message as "a very typical communication" from defendant with a "comforting tone." Although M.A. did not testify further regarding the contents of the text message in exhibit 3, the wording of the text stated as follows:

"My Dear [M.A.].

I hope you are sleeping well tonight. It's a cool 66 degrees right now here in DeKalb. That's perfect weather to have the windows open with a light westerly breeze. I imagine you now, lying in your king size bed with the ceiling fan on. I'm sure Edgar is somewhere in the mix as well.

Please know I am thinking of you at this moment***I have never sent such a picture to anyone. But given the pics you've entrusted to me, quid pro quo seems appropriate given the current state of our relationship."

¶ 38    After the wording of the text message, State's exhibit 3 included an attached photograph of a shirtless male wearing pants and holding his penis with his hand over the garment and the penis under the garment.

¶ 39    M.A. next testified that, on September 19, 2016, she had filed a verified petition in the circuit court of Kane County for a stalking no-contact order against defendant. Shortly after she filed the petition, defendant was placed on leave from his employment.

¶ 40    M.A. stated that, when she texted the photographs to defendant, she did not give him permission to share the photographs with anyone else. She never talked to defendant about sending the photographs to anyone else and she never sent the photographs to anyone else.

¶ 41    On cross-examination, M.A. testified that she did not recall whether her petition for a stalking no-contact order made any reference to the photographs she texted to defendant. Defendant presented defense exhibit 1, the no-contact petition, which was admitted over the State's objection, and the emergency order entered by the circuit court of Kane County. M.A. reviewed the petition and stated that she did not see any reference to the fact that she had sent photographs to defendant.

¶ 42    M.A. testified that she had filed a complaint with the school board against defendant on September 16, 2016. She acknowledged that the complaint did not mention the photographs that she sent to defendant. She also stated that she discussed the photographs with Victoria Newport, the school board president. Defense counsel asked M.A. whether the fact that she sent photographs to defendant would have been relevant to include in her legal action in Kane County and in her complaint to the school board. M.A. responded, "I don't believe so, no." She explained that the order of protection she sought in Kane County "was about the intimidation, the continual coming by my house, the gun, the bullets and the harassing and threatening phone calls that I was receiving from him."[2] Defense counsel asked M.A. why she did not include that information in either of her complaints. She responded, "[i]t was not at that point for those particular situations the most pressing part of it." When pressed further to explain why she did not "think that that might be material to the accusations" she was making against defendant, M.A. stated that she had provided that information to the school board and had provided the board with "every single text exchange that we had," including photographs. M.A. stated that she had been cooperative during the school board's investigation.

---

[2]This reference was not explained on the record.

¶ 43    Defendant next asked M.A. whether she was aware of the school board's conclusion following its investigation. M.A. responded affirmatively and stated that the board "couldn't conclude." Defendant asked M.A. whether the school board was unable to reach a conclusion due to her failure to cooperate. M.A. responded, "I don't believe so. I believe that they were trying to obtain my personal cell phone, which numerous attorneys had advised me not to do." According to M.A., the school board did not make clear whether it intended to scan her cell phone and limit recovery only to relevant interactions involving defendant. M.A. was informed that a private company would scan her cell phone and recover all the information in its entirety. M.A. acknowledged that the photographs at issue were saved on her cell phone. She thought that the photographs that she had sent to defendant would remain private.

¶ 44    After the school board members received the photographs of M.A. from an unidentified cell phone number, she initially spoke to the school resource officer, who suggested that she contact the DeKalb Police Department. During an interview with Detective Pristave on February 9, 2017, M.A. told the detective that the individual who took the photographs was a friend of hers.

¶ 45    Defendant next questioned M.A. regarding an e-mail that she had sent to defendant in September 2016, in which she provided a very detailed description of the individual who had taken the photographs. Defendant presented defense exhibit 3, the e-mail from M.A. to defendant, which was admitted without objection. The e-mail stated that a "male friend" or "ex-boyfriend" took the photographs. M.A. then read the text of the email into the record. Afterwards, defendant asked M.A. if she had spoken to the assistant state's attorney regarding defendant's motion to identify the individual who took the photographs. M.A. stated that she spoke to the assistant state's attorney regarding the motion and told her that she did not recall the name of the individual who took the

photographs, but also testified that she knew "it was someone that [she] had dated on occasion who lived out of state."

¶ 46    Defendant asked M.A., "you just read an email that you sent to [defendant] saying it was somebody that you'd known for nine years, and is it your testimony now under oath that you don't recall his name?" M.A. responded, "[t]hat's correct." M.A. stated that, when she received the requests from defendant to send sexually explicit photographs of her, the photographs she subsequently sent had already been taken at the hotel in downtown Chicago. The photographs were not taken as a direct request from defendant but, instead, were previously taken by another individual whose name M.A. could not recall. She further stated:

> "I don't remember his name. We had met up. He lived out of state. We had met up maybe three, four, possibly five times when he came into town to visit his daughter, and he would get a room for the weekend and I would spend the weekend with him, yes."

¶ 47    Defendant asked M.A. if the individual she had met up with would take photographs of her in a variety of poses. She responded, "no" and explained that "[t]his was just a one time kind of [thing where] we came back after a long night of drinking and being out and an adult evening, if you will." Defendant asked M.A. if there was anyone who could verify her testimony concerning the reason why the photographs were taken, and she responded, "[n]ot to my knowledge," explaining "[t]hat's why I felt very comfortable with them because they were just very private and for my purpose." When asked whether the individual could explain the facts and circumstances surrounding the taking of the photographs, M.A. answered, "I couldn't respond to that. I don't know what he would be able to do or say ***." Defendant asked, "[a]nd the reason you don't know

what he would do or say is because you don't remember who the person is; correct?" M.A. responded, "[t]hat's correct."

¶ 48    Defendant next asked M.A. questions regarding State's exhibit 2, the subject photograph, which depicted M.A. with her arms extended outward and her wrists hanging from straps attached to a curtain rod. He asked M.A. whether she could pull her hands out of the straps freely, and she responded, "[y]es." Defendant asked M.A.:

> "In fact, if you look at the photograph, you can see the space between your wrist
> and you can see the air showing the looseness. If you looked at your right hand
> from that angle, can't you see the space that exists between the strap and the top of
> your wrist?"

M.A. acknowledged that "there's a slight space, you're correct, yes." She further stated that she used the word "bondage" because "when we took the picture [it] was the intention of that picture, was to depict a bondage scenario."

¶ 49    Defendant then asked M.A., "[s]o your understanding of bondage is exactly that, taking—going to a room, taking those down?" M.A. responded, "[t]hat I'm being restrained on some level." She acknowledged that, "I guess just looking at the picture it's open to interpretation."

¶ 50    M.A. testified that defendant was her supervisor because he was the superintendent of the DeKalb school district and she was the principal of one of the DeKalb schools. She agreed that her relationship with defendant did not become "messy" until the last few weeks before she began to file complaints against him. She stated that she had a trusting relationship with defendant and "that was the expectation on both of our parts." She reiterated that she had shared the subject photographs only with defendant, which was verified by Detective Pristave when the detective

scanned her cell phone. M.A. stated that she allowed the police department, but not the school board's investigator, to scan her cell phone because she felt more comfortable with the police.

¶ 51 On redirect examination, M.A. testified that she never sent the photographs to the individual who took the pictures. She never posted the photographs to social media. M.A. stated that, during the school board's investigation, she spoke to Newport, the board's president, and told her about the photographs, but she did not show the photographs to Newport or any other members of the school board. M.A. had no reason to believe that defendant would send the photographs to anyone. She again testified that she did not know the name of the individual who took the photographs. The State asked M.A. why she told defendant that she had a closer relationship with the person who took the photographs than what she testified to. M.A. explained as follows:

> "Well, if you look at the start of that communication, it was that [defendant] had gotten upset with me for the date and he seemed a bit combative afterward, and I felt that my only way to kind of assuage the situation was to give some familiarity to it. I don't know how you would characterize or how an adult would characterize someone that you had met up with and gone out on a few dates with. I call them all friends, even my ex-boyfriends. I wouldn't call him a boyfriend *per se*, but I actually chose nine years as being the date as long as I had known [defendant] and I felt like I was doing that to maybe lessen the blow, if you will, because I felt that his reaction to hearing about that—instead of focusing on the photo, he had started asking me and questioning me about how those photos were taken or who would take those photos, and so my response to him was to maybe kind of lessen the significance of my relationship that I had had at the time with dating, for example."

¶ 52 On recross-examination, M.A. denied that she told a lie regarding the individual who took the photographs. She stated that she "had stretched out the time that I had known this individual." She stated that she did not lie to Detective Pristave regarding how long she had known the individual who took the photographs and was simply attempting to be consistent regarding what she had told both the detective and defendant.

¶ 53 2. Testimony of School Board Member Davis

¶ 54 Fred Davis testified that he served two terms on the DeKalb public school board from 2007 to 2011 and again from 2015 to 2019. At the start of Davis's second term on the school board, defendant was employed as the superintendent of the DeKalb public school system after having served as the principal of the high school.

¶ 55 During the 2015-16 school year, a vacancy opened for the principal position at one of the DeKalb schools. In the spring of 2016, the school board conducted a closed-door meeting to discuss the hiring of M.A. for the open principal position. Defendant was present for the meeting. After Davis asked a question at the meeting regarding the hiring process, defendant became upset. Ultimately, however, M.A. was hired to be the principal.

¶ 56 After the beginning of the 2016-17 school year, Davis became aware of issues between M.A. and defendant. Davis recalled that, shortly after the school year began, defendant went on medical leave. On February 7, 2017, the school board voted to accept a retirement settlement for defendant, in which defendant would not return as the superintendent.

¶ 57 On February 8, 2017, Davis received a text message from an unidentified cell phone number that included three photographs attached to the message. Davis viewed State's exhibits 1, 2, and 4, and confirmed that those were the photographs he received in the text message. He stated that the photographs fairly and accurately depicted the images he had received. State's exhibit 4

depicted a "waist-down" image and, for that reason, Davis could not identify the person depicted in exhibit 4. State's exhibit 4 was admitted into evidence without objection.

¶ 58 Davis testified that he recognized the person depicted in the photograph in State's exhibit 1 as M.A., as it was a "full frontal picture of her." The State asked Davis if he was able to see whether the same person was depicted in the photograph in State's exhibit 2. Davis responded that he could not identify the person in State's exhibit 2 because he could not see the person's face, although the clothing was the same.

¶ 59 After Davis received the photographs by text message, he called the school's liaison officer, DeKalb Police Officer Aaron Lockhart. Davis told Officer Lockhart that he would send him the photographs and asked the officer to "[c]all [defendant and ask him if this is him, to please stop this. I don't want to see him get in trouble over something this dumb."

¶ 60 On cross-examination, Davis testified that none of the school board members were aware of the photographs of M.A. until after they had received them. Prior to receiving the photographs, the school board did not receive any complaints regarding M.A.

¶ 61                    3. Testimony of School Board Member Hess

¶ 62 Mary Hess testified that she had served as a member of the DeKalb public school board from 2013 to 2017. In the beginning of the 2016-17 school year, Hess became aware of a complaint filed by M.A. against defendant. As a member of the school board, she participated in the decision to place defendant on leave while the allegations were investigated. At the conclusion of the investigation, the board entered into a retirement settlement with defendant, which the board voted to approve on February 7, 2017.

¶ 63 On February 8, 2017, Hess "received a text message with some pictures." Hess did not recognize the phone number from which the message was sent. The State then presented State's

exhibits 1, 2, and 4 to Hess, who stated that those were the photographs she had received on February 8 and that they accurately and fairly depicted those photographs. Hess stated that she was shocked to receive the photographs. The State then asked her, "[a]nything about those photographs that caused you to be shocked?" Hess responded that "one of them was clearly a private image that wasn't meant to be shared, I felt. It was sexual in nature." In response to receiving the photographs, Hess called Officer Lockhart to request guidance.

¶ 64    Hess met with a female detective at the DeKalb Police Department on February 10, 2017. She showed the detective the photographs and text message that she had received on February 8. Hess testified that the person depicted in State's exhibit 1 was M.A. When the State asked Hess whether M.A. was depicted in State's exhibit 2, Hess responded, "[w]ell, I couldn't see a face, but I was inclined to believe it was the same person."

¶ 65    On cross-examination, Hess acknowledged that the school board received a complaint from M.A. regarding defendant, which was privileged to the board members and handled in executive session. Hess did not recall whether the complaint to the school board remained private. The school board retained counsel to investigate the allegations in M.A.'s complaint. Hess was aware of the complaint M.A. filed in the circuit court of Kane County. Hess was unaware of the subject photographs until she received them in the text message on February 8, 2017.

¶ 66                          4. Testimony of Officer Lockhart

¶ 67    Officer Lockhart testified that during the 2016-17 school year, he served as the school resource officer for the DeKalb Police Department. He had served as a police officer, detective, and school resource officer in DeKalb for 26 years. In his position as school resource officer, Officer Lockhart regularly had contact with both the superintendent and the principal at the school where he served. Officer Lockhart stated that he knew both M.A. and defendant "pretty well," to

the extent that he also attended school social events and "afterwards we would sometimes go out and go for dinner and stuff like that." He also had regular contact with school board members and provided them with his cell phone number.

¶ 68 Officer Lockhart recalled that, on February 8, 2017, he received two text messages, one from Davis and one from Hess, regarding text messages that they had received from an unknown cell phone number. Officer Lockhart stated that "they received some photos of the principal [M.A.] in a sexual nature." He conducted a preliminary investigation, during which Davis had sent him the photographs before Officer Lockhart could tell him not to. Officer Lockhart viewed the photographs and identified that M.A. was depicted in them. The State then presented State's exhibits 1, 2, and 4, after which Officer Lockhart stated that he recognized the person depicted as M.A., the principal of the school, and that the photographs were "sexual in nature to me." The State asked Officer Lockhart what his initial reaction was when he received the photographs. Officer Lockhart responded that "they were sexual in nature and one of them appeared to be some type of like bondage of with—with ropes or straps."

¶ 69 After Officer Lockhart received the photographs, he contacted his supervisor to inform him of what was happening, "because at this point I kind of felt like this might be a conflict." He contacted M.A., who was unaware that the photographs of her had been disseminated to the school board members. M.A. became very concerned, telling Officer Lockhart, " 'Oh my gosh. *** This could be my job. I'm a principal here. What are people going to think[?] *** This is something that I didn't give anyone permission to submit to send to others.' " M.A. also immediately told Officer Lockhart, " 'I do know what photos you're talking about. I had sent the photos to [defendant] a year prior and those photos must have came [sic] from [defendant].' " Officer Lockhart clarified with M.A. that she had not given permission to disseminate the photographs of

her to the school board members. Due to the conflict of interest with Officer Lockhart serving as the school resource officer, the police department assigned the case to another detective.

¶ 70 Officer Lockhart next testified regarding the police report he prepared regarding this incident. The State presented the police report as State's exhibit 7, to which defendant objected on the basis of hearsay, and the circuit court reserved ruling on the objection and ordered the parties to proceed with a standing objection pending a ruling. Once Officer Lockhart reviewed the police report he had prepared, the State asked him to read the text message the school board members received on February 8, 2017, into the record. Defense counsel stated that he had no objection, stating "I don't even care if the Court gets the report, Judge." Officer Lockhart then read the entire wording of the text message into the record:

> "Hey, board members. Here are three of five pictures of [M.A.] sent to me by another parent. I didn't send the other two because they are pornographic pictures of [M.A.] and I don't want to distribute pornography. Like me, she is also disgusted by the way [defendant] was treated by you. She stated to me all five pictures will soon be posted on the web. Thought you should know this before it happens. This is all I'm saying and wish to remain anonymous because my youngest child is [a] student and a couple of teachers told me [M.A.] is very vindictive, so I am afraid she will retaliate against him if she finds out I sent these pictures to you."

¶ 71 After further discussion between the parties, defendant withdrew his objection to State's exhibit 7 and the exhibit was admitted into evidence. On cross-examination, Officer Lockhart testified that, prior to February 8, 2017, he was unaware of the photographs of M.A. or any issues between M.A. and defendant.

¶ 72                              5. Testimony of Verizon Analyst Morrow

¶ 73    Dion Morrow, a senior analyst in executive relations for Verizon, testified that he regularly appears in court to testify regarding cell phone records. When a police agency sends a search warrant to Verizon to recover cell phone records, Verizon validates the request and searches its billing system and network to find the records to match the request from the search warrant. Once the records are validated, Verizon submits them to the requesting party.

¶ 74    Morrow testified that he received two search warrants related to this case, corresponding to two separate cell phone numbers. The State presented Morrow with State's exhibits 5 and 6, which Morrow identified as Verizon records containing subscriber information listed for the two cell phone numbers identified in the warrants. State's exhibits 5 and 6 were admitted without objection.

¶ 75    In State's exhibit 5, a cell phone number with 224 area code, activated on January 14, 2017, belonged to a subscriber belonged to a subscriber named Kenneth Denk. State's exhibit 6 contained cell phone records related to a search warrant for a cell phone with an 815 area code. State's exhibits 5 and 6 included records of text messages, phone calls, cell phone tower usage, and other information kept by Verizon in the ordinary course of business.

¶ 76                              6. Testimony of Kenneth Denk

¶ 77    Next, Kenneth Denk testified that defendant had served as his dean when he was a student in Elgin in 2007. Denk stated that defendant helped him throughout school and that they remained friends after he graduated. Denk identified defendant in court.

¶ 78    On January 14, 2017, Denk ate lunch with defendant and then defendant drove him to the Best Buy store on Randall Road in South Elgin. Defendant asked Denk to "do him a favor." Defendant asked Denk, "[c]an you get me a [cell] phone? I'll give you the money to go get it."

Defendant provided Denk with cash and Denk went inside the store to purchase a cell phone. After Denk purchased the cell phone, he immediately gave it to defendant and told him that it had been activated. Denk never used the cell phone.

¶ 79 Denk testified that defendant told him he wanted the cell phone because "he was trying to contact somebody without that person knowing it was him." Eventually, a police officer interviewed Denk regarding the cell phone that he purchased for defendant, and he told the police officer the same information that he testified to in court.

¶ 80                            8. Testimony of Detective Pristave

¶ 81 Detective Pristave testified that she had been serving as a patrol officer for the DeKalb Police Department since 2013. On February 8, 2017, her supervising officer assigned her to this case after Officer Lockhart filed an initial report. The State presented State's exhibits 1, 2, and 4 to the detective, which she acknowledged were the pictures that were sent to the school board members. Detective Pristave described the image depicted in State's exhibit 2 as "some type of room with [what] looks like a bed in it," with "[M.A.] from the back." Detective Pristave stated that M.A. was "wearing a thong underwear and a bra only and *** both her wrists are bound by some kind of strap." The image depicted in State's exhibit 2 required further investigation. Detective Pristave testified that, "[d]ue to the nature of what's in the picture, how I interpreted what I was looking at, it appears to be some kind of sexual activity going on in the picture."

¶ 82 On February 9, 2017, Detective Pristave interviewed M.A. at the DeKalb Police Department regarding the dissemination of the photographs. She stated that M.A. was upset. Detective Pristave asked M.A. for consent to download the contents of her cell phone, to which M.A. agreed. The following day, the detective met with Hess, who confirmed that she had received three photographs. Detective Pristave noted the cell phone number that had transmitted the

photographs, which began with a 224 area code. Once she obtained the cell phone number, she obtained a search warrant from Verizon for the records corresponding to the phone number.

¶ 83    Next, the State presented State's exhibit 5 to Detective Pristave, which consisted of the records obtained from the cell phone with the 224 area code. Through the search warrant, Detective Pristave learned that the subscriber associated with the cell phone account was Kenneth Denk. The records showed that the phone was activated on January 14, 2017. Detective Pristave also observed that, on February 8, 2017, the day the school board members received the photographs, the cell tower that connected with the phone line from the cell phone was on Barber Greene Road in DeKalb. She explained that defendant had been named "by numerous people up until that point as a possible involved party in the case and [she] saw on DeKalb County tax records that there was property owned by the defendant at Legacy Drive, which is about .6 miles from that cell tower."

¶ 84    On February 16, 2017, Detective Pristave interviewed Denk regarding the cell phone account. He told the detective that he had purchased the cell phone at Best Buy on Randall Road in South Elgin. After speaking to Denk, Detective Pristave obtained a search warrant for defendant's cell phone. She identified defendant in court.

¶ 85    Detective Pristave received defendant's cell phone records from Verizon on March 27, 2017. The State presented the detective with State's exhibit 6, which was the Verizon response to the search warrant for defendant's cell phone content. Detective Pristave testified that the records fairly and accurately reflected the search warrant response she had received from Verizon associated with defendant's cell phone account. She observed that, on January 14, 2017, defendant's cell phone sent three text messages to the cell phone Denk had purchased. In addition, defendant made a phone call from his cell phone to the suspect phone on January 14, 2017, an hour after the phone had been purchased from Best Buy. The State also presented State's exhibit 8 to

Detective Pristave, which she described as an e-mail from Best Buy with the receipt of purchase for the cell phone Denk bought for defendant. Detective Pristave stated that State's exhibit 8 fairly and accurately depicted the receipt of purchase of the phone from Best Buy. State's exhibit 8 was admitted into evidence without objection. Detective Pristave obtained an arrest warrant for defendant on April 13, 2018.

¶ 86 On cross-examination, defendant asked Detective Pristave questions regarding whether M.A. was depicted as bound in the photograph comprising State's exhibit 2. Defendant asked the detective, "[w]hen you talked to [M.A.] upon beginning your investigation, did you ask her if her hands were indeed bound?" The detective responded, "I don't recall using those words, no." Defendant also asked, "[d]id you ever ask [M.A.] if she was able to move her hands in and out of the straps, I think you described as straps?" Detective Pristave stated in response, "I don't believe I asked her that." Defendant further asked the detective if M.A. appeared to be restrained in the photograph. The detective replied that she did not recall. M.A. did not tell Detective Pristave the name of the individual who took the photographs and the detective did not ask M.A. to identify the person who took the photographs. Detective Pristave stated that she "made a deduction based on what the content of the photo was in that she knew the person taking the photo in a hotel." Detective Pristave did not ask M.A. if she was restrained or engaging in bondage in the photograph. Detective Pristave agreed that the information she received regarding the taking of the photograph was limited to the conversation she had with M.A. She did not follow up to investigate the identity of the individual who took the photograph even after defendant was arrested.

¶ 87 C. Motion for Directed Finding

¶ 88 Following Detective Pristave's testimony, the State rested and defendant moved for a directed finding, essentially arguing that State's exhibit 2 showed that M.A. was not restrained or

bound within the meaning of section 11-23.5 of the Code. Defendant also argued that M.A.'s testimony regarding the individual who took the photographs was not credible because she both refused to provide or forgot the name of that person. Defendant contended that M.A. ultimately "created this person because [she] thought this person was the person that [defendant] would want [her] to say took the photograph." He argued that, because a potential conviction could stand on the basis of her incredible testimony, her inability to name the individual violated his fundamental due process rights. The circuit court denied defendant's motion. Defendant chose not to testify and rested his case.

¶ 89                              D. Finding of Guilt

¶ 90    After closing argument, the circuit court took the case under advisement. On December 5, 2022, the court conducted a hearing in which it provided its findings and rendered a finding of guilt against defendant. The court found M.A.'s testimony credible as it related to the sending of the image depicted in State's exhibit 2. The court stated:

> "The nature of the photograph suggests that it is to be private. It was not sent as a blast text to a number of people. Additionally, the defendant's response to the receipt of the photograph confirms the private nature of the picture.
>
> In [State's] Exhibit No. 3 the defendant responds to receiving this photograph by saying in part, 'Please know I am thinking of you at this moment. I never sent such a picture to anyone but given the pics you've entrusted to me' and then it goes on and says some other things. He then attaches an image to the words in this text of a man with pants on holding his penis. The key part, at least in my mind, is the phrase 'but given the pics you've entrusted to me' shows me that he

knew the image was to remain private and that [M.A.] had not nor would have consented to the dissemination of it."

¶ 91 The circuit court also noted the measures defendant took to conceal how the photographs were sent to school board members. The court stated that defendant "would not have gone to the lengths that he did *** so that no one would know that he had sent them." Based on the evidence, the court found it was reasonable to infer that defendant was the person who sent the image depicted in State's exhibit 2.

¶ 92 The circuit court next addressed whether the image depicted a person engaged in a sexual act under section 11-23.5 of the Code. The court stated:

"[T]he record should reflect that I've looked at the image a number of times not only at trial but in preparation for my ruling today. It shows the backside of a woman in what appears to be a bra and thong. Her hands are attached to the curtain rod of the room that she is in. Her intimate parts as defined by the statute are not exposed in whole or in part. That leaves the issue as being is she engaged in a sexual act.

* * *

[M.A.] testified that this photograph was taken in a hotel room where one other person was present and that it is the other person who was present that took the photograph. [M.A.] testified that the picture was meant to depict bondage and that she considered herself restrained.

Ultimately, however, it's for the Court to make this determination. In the Court's opinion based on the context of the picture and the content of the picture and the reason that it was shared with the defendant that it does meet this definition.

Her freedom is limited. Based on [M.A.'s] attire and the posture in which she is posed she is tied up for sexual pleasure.

Therefore, based on the credible testimony of the State's witnesses and all the evidence, the Court finds the State has proven each and every element of the offense of nonconsensual dissemination of private sexual images beyond a reasonable doubt and there will be a finding of guilty."

¶ 93 In addition to its findings in open court, the circuit court also entered a December 5, 2022, written order finding defendant guilty of nonconsensual dissemination of private sexual images. The court continued the case for a sentencing hearing on January 31, 2023.

¶ 94 E. Posttrial Motion

¶ 95 On January 3, 2023, defendant moved for a new trial, arguing that the image from State's exhibit 2 did not depict bondage. He contended that "[i]t is clear from [M.A.'s] testimony that her freedom was not limited in any manner nor was she tied up as required" by the supreme court's decision in *Austin*, 2019 IL 123910. He also challenged the credibility of M.A.'s testimony, arguing that the circuit court's task as the trier of fact "was made particularly difficult considering her intentional obstruction of the facts and circumstances surrounding the taking of the photograph, which further created reasonable doubt as to the nature of [State's] Exhibit 2."

¶ 96 On January 31, 2023, the circuit court heard defendant's motion for a new trial. Following the parties' arguments, the court stated that it was skeptical of the fact that M.A. did not remember who took the subject photograph. The court continued,

"That being said, in regards to the actual elements of the offense, I thought that—even beyond her credibility in regards to the actual elements of the offense, most

of the elements of the offense were not in dispute in regards to *** what happened here. And that is that this picture was taken."

The court stated that M.A. testified credibly as to the elements of the offense necessary to prove defendant guilty and that the case "was almost—could have been a stipulated bench trial in many respects as it relates to the evidence that was introduced." The court found that M.A. testified that, "in her opinion, she considered herself to be restrained, that the picture was taken to depict bondage, that she was kind of tied up." The court believed that M.A.'s testimony corroborated what was depicted in the subject photograph. The court held that the State met its burden to prove all the elements of the offense charged and denied defendant's motion for a new trial.

¶ 97 The circuit court accepted the parties' sentencing agreement, wherein defendant was sentenced to conditional discharge on January 31, 2023. The court entered a written sentencing order on the same date. This appeal followed.

¶ 98                                              II. ANALYSIS

¶ 99 On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that the subject photographic image depicted M.A. engaged in a sexual act under section 11-23.5 of the Code. Defendant also contends that section 11-23.5 is unconstitutionally vague on its face and, thus, violates federal and state constitutional protections of substantive due process. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In addition, defendant argues that he was denied due process when the circuit court failed to secure his right to have access to the individual who took the photograph of the subject image. Finally, he contends that our supreme court wrongfully decided *Austin*, 2019 IL 123910, because it held that only intermediate scrutiny of the statute is required under the first amendment, rather than strict scrutiny, as set forth in the dissenting opinion. We address each issue in turn.

¶ 100                              A. Sufficiency of the Evidence

¶ 101   Defendant first argues that the State failed to prove beyond a reasonable doubt the essential element that the subject photograph was an image of a person engaged in the act of sexual bondage or any other sexual activity. He contends that the image and the other circumstances of this case "merely show an act of simulated, virtual, fictional or staged conduct that fails to include any of the restraining, painful, controlling or coercive activity that necessarily is a part of the activity of sexual bondage." In short, defendant argues that the State failed to prove that the image depicted bondage under the statute because M.A. testified that she could easily escape the fabric loops that encircled her wrists. Further, according to defendant, because the image did not depict M.A. deriving sexual pleasure, it likewise did not demonstrate that she was engaged in sexual activity under section 11-23.5 of the Code. Essentially, defendant argues that the statute requires that an image of bondage cannot be staged, that the bound individual must be tied tightly enough to be unable to escape, and that the bound person must experience some form of sexual pleasure. We disagree.

¶ 102   Defendant's first argument presents both a statutory interpretation issue as to the meaning of the word, "bondage," and an issue regarding the sufficiency of the evidence presented at trial. A challenge to the sufficiency of the evidence requires the reviewing court to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the

credibility of the witnesses and the weight of the evidence." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 25.

¶ 103    We draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43) and do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 104    The primary rule of statutory construction is to ascertain and give effect to the intention of the legislature, "the surest and most reliable indicator of which is the statutory language itself, given its plain and ordinary meaning." *People v. Perry*, 224 Ill. 2d 312, 323 (2007). In assessing the meaning of the statutory language, a reviewing court "may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Austin*, 2019 IL 123910, ¶ 96. If the statutory language is clear and unambiguous, we must apply it as written, without using extrinsic aids to statutory construction. *Perry*, 224 Ill. 2d at 323. We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *Id.* at 323-24. Since all provisions of a statutory enactment are viewed as a whole, we do not construe words and phrases in isolation; instead, we interpret them in light of other relevant portions of the statute. *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 507-08 (2003). We further presume that the legislature did not intend absurdity, inconvenience, or injustice. *Id.* at 508. We review the construction of a statute *de novo*. *Perry*, 224 Ill. 2d at 324.

¶ 105   Our supreme court stated that the statute in this case "is intended to protect living victims from the invasion of privacy and the potential threat to health and safety that is intrinsic in the disclosure of a private sexual image." *Austin*, 2019 IL 123910, ¶ 96. Further, it is intended "to protect living persons from being victimized by harassment, discrimination, embarrassment, and possible violence resulting from the privacy violation occasioned by the nonconsensual dissemination of private sexual images." *Id*. ¶ 99. With these principles in mind, we turn to the interpretation of section 11-23.5 as it relates to bondage.

¶ 106   Section 11-23.5 of the Code is entitled, "Non-consensual dissemination of private sexual images." 720 ILCS 5/11-23.5 (West 2016). Under section 11-23.5(a), "[s]exual activity" means any:

"(1) knowing touching or fondling by the victim or another person or animal, either directly or through clothing, of the sex organs, anus, or breast of the victim or another person or animal for the purpose of sexual gratification or arousal; or

(2) any transfer or transmission of semen upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or another; or

(3) an act of urination within a sexual context; or

(4) any bondage, fetter, or sadism masochism; or

(5) sadomasochism abuse in any sexual context." *Id*. § 11-23.5(a).

¶ 107   Pursuant to section 11-23.5(b), "[a] person commits non-consensual dissemination of private sexual images when he or she":

"(1) intentionally disseminates an image of another person:

(A) who is at least 18 years of age; and

(B) who is identifiable from the image itself or information displayed in connection with the image; and

(C) who is engaged in a sexual act or whose intimate parts are exposed, in whole or in part; and

(2) obtains the image under circumstances in which a reasonable person would know or understand that the image was to remain private; and

(3) knows or should have known that the person in the image has not consented to the dissemination." *Id.* § 11-23.5(b).

¶ 108 In this case, the State prosecuted defendant under section 11-23.5 for nonconsensual dissemination of private sexual images in that he disseminated a photograph of M.A. engaged in the sexual act of "bondage." Our supreme court in *Austin* considered the meaning of "bondage" in the statutory context, noting that section 11-23.5 did not include a specific definition for that term. *Austin,* 2019 IL 123910, ¶ 95. The *Austin* court quoted the definition of the term in Black's Law Dictionary to mean " '[t]he state or condition of being a slave; *** the condition or state of having one's freedom limited[;] *** [t]he state or practice of being tied up for sexual pleasure.' " *Id.* (quoting Black's Law Dictionary 216 (10th ed. 2014)). Relevant here, the court stated that "[o]nly that portion of the definition relating to 'sexual pleasure' has any relevance in the context of section 11-23.5(b)" and that "[i]mages depicting arrestees, prisoners, slaves, or escape artists are not sexual in nature and, therefore, do not fall within the purview of section 11-23.5(b)." *Id.*

¶ 109 In *Austin*, the defendant was engaged to be married to Matthew after they had dated for more than seven years. *Id.* ¶ 3. The defendant and Matthew shared a cloud computer storage account and, therefore, their data could be shared and accessed on their various web-enabled

devices. *Id*. Although Matthew was aware of the data sharing capabilities of the cloud account, he took no action to disable it. *Id*. While Matthew and the defendant were engaged and living together, he exchanged text messages with the victim, a neighbor, which appeared on the defendant's tablet. *Id*. ¶ 4. Some text messages included nude photographs of the victim. *Id*. Both Matthew and the victim were aware that the defendant had received the pictures and text messages on her tablet. *Id*. Eventually, the wedding was cancelled and the defendant and Matthew ended their relationship. *Id*. ¶ 5. Matthew claimed to his family and friends that the breakup occurred "because defendant was crazy and no longer cooked or did household chores." *Id*. In response, the defendant wrote a letter explaining her version of events and attached to the letter four naked pictures of the victim, along with copies of the text messages between the victim and Matthew. *Id*. ¶ 6. The victim told police that the pictures were private and only intended for Matthew to see. *Id*. ¶ 7. She thought that the shared cloud account had been deactivated before she sent the nude photographs to Matthew. *Id*.

¶ 110 The defendant was charged with one count of nonconsensual dissemination of private sexual images under section 11-23.5(b). *Id*. ¶ 8. She moved to dismiss the indictment, arguing that the statute was facially unconstitutional because it was a content-based restriction of speech that was not narrowly tailored to serve a compelling government interest, in violation of the federal and state constitutions. *Id*. The circuit court agreed with the defendant and found section 11-23.5(b) unconstitutional on its face. *Id*. ¶ 10. The State appealed directly to the supreme court under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013). *Id*.

¶ 111 The State argued before the supreme court that the circuit court erred when it found section 11-23.5 unconstitutional, because the public distribution of truly private facts is not constitutionally protected. *Id*. ¶ 12. The State contended in the alternative that, "even if such speech

is protected, section 11-23.5(b) is constitutionally valid because it is narrowly tailored to serve a compelling government interest." *Id.*

¶ 112 The *Austin* court first explained the necessity for enacting section 11-23.5, in that it addressed the problem of nonconsensual dissemination of private sexual images, otherwise known as " 'revenge porn.' " *Id.* ¶ 17. The court stated that the crime generally "involves images originally obtained without consent, such as by use of hidden cameras or victim coercion, and images originally obtained with consent, usually within the context of a private or confidential relationship." *Id.* According to the court, "[o]nce obtained, these images are subsequently distributed without consent." *Id.* (citing Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 Wake Forest L. Rev. 345, 346 (2014) and Adrienne N. Kitchen, *The Need to Criminalize Revenge Porn: How a Law Protecting Victims Can Avoid Running Afoul of the First Amendment*, 90 Chi.-Kent L. Rev. 247, 247-48 (2015)).

¶ 113 Further, the supreme court explained that the term, "revenge porn," is misleading in two ways:

"First, 'revenge' connotes personal vengeance. However, perpetrators may be motivated by a desire for profit, notoriety, entertainment, or for no specific reason at all. The only common factor is that they act without the consent of the person depicted. Second, 'porn' misleadingly suggests that visual depictions of nudity or sexual activity are inherently pornographic." *Id.* ¶ 18 (citing Mary Anne Franks, *"Revenge Porn" Reform: A View From the Front Lines*, 69 Fla. L. Rev. 1251, 1257-58 (2017), and Diane Bustamante, *Florida Joins the Fight Against Revenge Porn: Analysis of Florida's New Anti-Revenge Porn Law*, 12 FIU L. Rev. 357, 364 (2017)).

¶ 114   The *Austin* court also noted the difficulty of criminalizing this kind of conduct in such a rapidly changing technological world. Indeed, "[b]ecause the nonconsensual dissemination of private sexual images 'so often involves the Internet and social media, the public, law enforcement, and the judiciary sometimes struggle to understand the mechanics of the conduct and the devastation it can cause.' " *Id*. ¶ 19 (quoting Citron & Franks, *supra*, at 347). The court also stated that the breadth of the problem is staggering, necessitating the enactment of statutes throughout the United States criminalizing this conduct. *Id*. ¶ 22. Illinois enacted its statute in 2015. *Id*. ¶ 23 (citing Pub. Act 98-1138, § 5 (eff. June 1, 2015) (adding 720 ILCS 5/11-23.5)).

¶ 115   Next, the *Austin* court considered whether the nonconsensual dissemination of private sexual images under section 11-23.5 violated first amendment protections of free speech. *Id*. ¶ 33. The State asked the court "to recognize the nonconsensual dissemination of private sexual images as 'a category of speech that has not been protected as a historical matter.' " *Id*. The court explained that there are categories of speech not requiring first amendment protections because they are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality,' " including "incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent." (Internal quotation marks omitted.) *Id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992), and citing *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (collecting cases)). Our supreme court found that section 11-23.5(b) did not fall within an established first amendment categorial exception and declined to identify a new categorical first amendment exception because the United States Supreme Court had yet to address the question. *Id*. ¶ 36. The court found that

section 11-23.5(b) implicates freedom of speech and that first amendment scrutiny is warranted. *Id.* ¶ 37.

¶ 116   The supreme court continued its analysis to determine the degree of scrutiny to be applied to content-based restrictions on speech in the context of section 11-23.5. *Id.* ¶ 39. Courts " 'apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.' " *Id.* ¶ 40 (quoting *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 642 (1994)). The court explained that "[a] content-based law is justified only if it survives strict scrutiny, which requires the government to demonstrate that the law is narrowly tailored to serve a compelling state interest." *Id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). The government is required to identify an " 'actual problem' in need of solving [citation], and the curtailment of free speech must be actually necessary to the solution [citation]." (Internal quotation marks omitted.) *Id.* "In other words, if a less restrictive alternative would serve a governmental purpose, a legislature must use that alternative." *Id.* (citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000)).

¶ 117   The parties in *Austin* premised their arguments on the assumption that section 11-23.5(b) must survive strict scrutiny to be found constitutional. The supreme court stated that it was not bound by the parties' assumption and instead concluded that section 11-23.5(b) was subject to an intermediate level of scrutiny because (1) "the statute is a content-neutral time, place, and manner restriction" and (2) "the statute regulates a purely private matter." *Id.* ¶ 43. In short, the court held that an intermediate level of scrutiny applied because the statute posed a less substantial risk of excising certain ideas or viewpoints from the public dialogue. *Id.* (citing *Turner Broadcasting System*, 512 U.S. at 642).

¶ 118　The *Austin* court explained that section 11-23.5(b) was justifiably enacted to protect privacy:

> "Section 11-23.5(b) distinguishes the dissemination of a sexual image not based on the content of the image itself but, rather, based on whether the disseminator obtained the image under circumstances in which a reasonable person would know that the image was to remain private and knows or should have known that the person in the image has not consented to the dissemination. \*\*\* The *manner* of the image's acquisition and publication, and not its *content*, is thus crucial to the illegality of its dissemination." (Emphases in original.) *Id*. ¶ 49 (citing 720 ILCS 5/11-23.5(b)(2), (3) (West 2016)).

¶ 119　In addition, the *Austin* court concluded that section 11-23.5(b) is subject to an intermediate level of scrutiny "because the statute regulates a purely private matter," rather than a matter of public concern, which lies at the heart of first amendment protection. *Id*. ¶ 53. Thereafter, the court applied intermediate scrutiny in the context of the first amendment's freedom of speech guarantee, finding that section 11-23.5 served a substantial government interest in protecting privacy rights. *Id*. ¶¶ 61-62, 65 (noting that "speech on matters of private concern that invades privacy interests of nonpublic figures does not enjoy the same degree of first amendment protection as speech on matters of public concern or relating to public figures"). Specifically, the court noted that "the nonconsensual dissemination of private sexual images causes unique and significant harm to victims," for example, when perpetrators "threaten disclosure to prevent victims from ending relationships." *Id*. ¶ 66. Further, "the victims' private sexual images are disseminated with or in the context of identifying information," such that the victims may be "harassed, solicited for sex,"

or, relevant here, receive threats or termination from their employment and lose future employment opportunities. *Id*. ¶ 67.

¶ 120　The *Austin* court also found that section 11-23.5 was narrowly tailored to serve a substantial government interest without unnecessarily interfering with first amendment protections. *Id*. ¶¶ 70-76. Thus, the "narrowly tailored" requirement of intermediate scrutiny was satisfied because, the court concluded that "the law promotes a substantial government interest that would be achieved less effectively absent the law." *Id*. ¶ 70. The court explained that the legislature "reasonably determined, in the exercise of the police power, that a criminal law was necessary to combat the evils of nonconsensual dissemination of private sexual images." *Id*. ¶ 76. In addition, the court found that the statute does not burden substantially more speech than necessary. *Id*. ¶ 85.

¶ 121　The *Austin* court also addressed whether section 11-23.5(b) is facially unconstitutional because it is overbroad. *Id*. ¶ 88. "The first amendment overbreadth doctrine looks not at whether a law improperly regulates speech based on viewpoint or content but at the appropriate scope of the regulation." *Id*. ¶ 89. "However, the overbreadth doctrine permits a party to challenge a statute as a facial violation of the first amendment, even if that party's conduct would not fall within the amendment's protection." *Id*. Under the overbreadth doctrine of the first amendment, " 'a statute is facially invalid if it prohibits a substantial amount of protected speech.' " *Id*. ¶ 90 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). "The doctrine operates to balance two competing social costs—the chilling effect on constitutionally protected speech against the invalidation of a law that is entirely constitutional in some of its applications." *Id*. (citing *Williams*, 553 U.S. at 292). The court concluded that the narrowly focused scope of section 11-23.5(b) does not prohibit a substantial amount of protected speech when judged in relation to "the statute's legitimate sweep." *Id*. ¶ 93.

¶ 122    Finally, the *Austin* court addressed whether the statute is unconstitutionally vague on its face in violation of due process. *Id*. ¶ 111. The defendant claimed that the statute was void for vagueness, premised upon the notice requirement of the due process clause. Whether a statute is vague may be challenged on either of two grounds: "(1) it fails to give fair warning to allow innocent people to steer clear of its prohibitions, or (2) it contains insufficiently clear standards for those who enforce it and may lead to arbitrary or discriminatory enforcement." *Id*. (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Further, when a statute involves first amendment rights, "it should not be so vague that it chills the exercise of free expression by generating concern over whether such conduct may violate the statute's prohibition." *Id*. If a statute interferes with the right of free speech, " 'a more stringent vagueness test should apply.' " (Internal quotation marks omitted.) *Id*. (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010)). However, " 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' " (Internal quotation marks omitted.) *Id*. (quoting *Williams*, 553 U.S. at 304).

¶ 123    The supreme court explained the basis for a vagueness claim:

> "A vagueness claim based on due process is analytically distinct from a first amendment overbreadth claim and does not depend upon whether a law applies to a substantial amount of protected speech. [Citation.] A facial challenge to a statute that is premised on due process vagueness grounds can succeed only if the enactment is impermissibly vague in all of its applications. A [litigant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. [Citation.] That rule makes no exception for conduct in the form of speech. [Citation.] Therefore, the determination of whether a statute is unconstitutionally vague must be decided based on the

particular facts before the court. [Citation.] Even where a more stringent standard of vagueness applies, a litigant whose speech is clearly proscribed cannot successfully assert a due process claim for lack of notice. [Citation.] And he certainly cannot do so based on the speech of others." (Internal quotation marks omitted.) *Id.* ¶ 112.

¶ 124 The *Austin* court addressed only whether the statute provided fair warning sufficient to avoid prosecution. *Id.* ¶ 113. Critically, the court assessed whether the statute provided " 'people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits so that one may act accordingly.' " *Id.* (quoting *Wilson v. County of Cook*, 2012 IL 112026, ¶ 21). The defendant challenged the statute as unconstitutionally vague because the term "disseminate" was not defined in the statute. *Id.* ¶ 114. The court presumed both the ordinary and popularly understood meaning of the term as well as the dictionary definition of the word " 'to foster general knowledge of' " and included its synonyms, to broadcast, publicize, and spread. *Id.* ¶ 115 (quoting Webster's Third New International Dictionary 656 (1993)). The court found that the defendant "sent a letter to at least one other person that included the private sexual images of the victim without her consent" and that conduct "unquestionably 'foster[ed] general knowledge of' the victim's image" and essentially publicized it. *Id.* The court then concluded that the defendant's conduct "clearly fell within the statutory proscription, and she cannot claim that it was vague for lack of notice as to her circumstances." *Id.*

¶ 125 In this case, defendant states in his opening brief that he does not quarrel with *Austin*'s interpretation of the statute's limited scope. According to defendant, the supreme court's decision did not serve to describe the sexual nature of the conduct that he claims is necessary to prove "bondage" under the statute. Defendant cites a multitude of federal and extrajurisdictional cases

in support of his argument; however, none of these cases are applicable because they are either devoid of any discussion of the term, "bondage," or, if they do involve a discussion of the term, "bondage," they are in the context of obscenity laws, sentencing guidelines, and admissible evidence, none of which implicates the same invasion of privacy concerns as the instant case. See, *e.g.*, *United States v. Richardson*, 238 F.3d 837 (7th Cir. 2001) (involving sentencing guidelines for child pornography that displayed images of bondage); *Brownell v. City of Rochester*, 190 F. Supp. 2d 472, 478 n.4 (W.D.N.Y. 2001) (defining "[s]pecified sexual activities," including "sadomasochism" but not bondage, in a case involving city ordinance restricting nude barroom dancing); *State v. Bravo*, 343 P.3d 306 (Utah Ct. App. 2015) (explaining relevancy for admitting evidence of prior sexual activity in a criminal prosecution); *State v. Reece*, 757 P.2d 947 (Wash. 1988) (determining that a magazine depicting nude and scantily clad persons engaged in acts of flagellations, beatings, and torture constituted obscene material within the meaning of the applicable statute). Furthermore, the local precedent defendant cited and relied upon, *People v. Anderson*, 130 Ill. App. 3d 318 (1985), likewise is inapplicable because, although the court there discussed "bondage," it considered the term in the context of whether it applied under obscenity laws in effect at that time. See *id.* at 324 (reviewing magazines to determine whether they were obscene and stating, "[w]hile defendant is correct that in none of these cases previously discussed was a court required to decide whether bondage scenes alone were obscene, this fact does not necessitate the conclusion that the publications here are not obscene").

¶ 126   Nevertheless, defendant argues that the activity depicted in the subject image of M.A. is "fundamentally different" than bondage activity recognized by case law and dictionary definitions. He claims that bondage is not generally applied to a static image, such as a photograph in isolation, but rather, to a species of conduct. Under that interpretation, however, any static photograph of a

person with their hands tied could never be "bondage." He also claims that bondage must depict discomfort and pain, while also depicting some form of sexual arousal. He argues that "[i]t is not merely play-acting of a serene scene such as that depicted" in State's exhibit 2.

¶ 127   Section 11-23.5(a) categorizes "*any* bondage" as " '[s]exual activity.' " (Emphasis added.) 720 ILCS 5/11-23.5(a) (West 2016).[3] Thus, we first consider the plain and ordinary meaning of the word "any," which precedes the term "bondage." "Any" is not a vague term and instead is considered to be all-encompassing. Indeed, "any" is defined as "one indifferently out of more than two" and "one, some, or all indiscriminately of whatever quantity." Webster's Third New International Dictionary 97 (1986). In short, no matter which way defendant argues that the definition of the term "bondage" should be limited, the wording of section 11-23.5(a) does not provide such a limitation.

¶ 128   The statute, however, does not include a definition for "bondage." Thus, the term should be given its ordinary and generally understood meaning. *Kosakowski v. Board of Trustees of the Calumet City Police Pension Fund*, 389 Ill. App. 3d 381, 385 (2009). Our supreme court in *Austin*, relying on Black's Law Dictionary, stated that "bondage" includes " 'the condition or state of having one's freedom limited,' " or " '[t]he state or practice of being tied up for sexual pleasure.' " 2019 IL 123910, ¶ 95 (quoting Black's Law Dictionary 216 (10th ed. 2014)). Webster's Dictionary defines the term, "bondage," in numerous ways, but pertinent here, it means "the quality or state of being bound," although the definition is not elaborated upon in a sexual context in the examples

_____

[3]Indeed, section 11-23.5(a) actually includes a typographical error, stating that " '[s]exual activity' means any," and subsection (4) then states, "any bondage," thus reading as "any any bondage." 720 ILCS 5/11-23.5(a) (West 2016).

following the definition. See Webster's Third New International Dictionary 250 (1986). The online version of Merriam-Webster's Dictionary provides the definition of bondage as "sadomasochistic sexual practices involving the physical restraint of one partner." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/bondage (last visited Feb. 21, 2024) [https://perma.cc/MA43-KMJT]. A more colloquial definition of "bondage" is included online in the Urban Dictionary, which describes bondage as, among other things, "[t]ying up or restraining your consenting sexual partner." See *Urban Dictionary: Bondage*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Bondage (last visited Feb. 21, 2024) [https://perma.cc/V7XB-DK4M].

¶ 129   Considering the above definitions, the subject image of M.A. in this case clearly includes a depiction of "bondage" as intended under section 11-23.5(a). The circuit court specifically stated in its findings that the image "shows the backside of a woman in what appears to be a bra and thong. Her hands are attached to the curtain rod of the room that she is in." As the factfinder, the court gleaned from M.A.'s testimony and the subject image that her freedom was limited and that, based on her attire and the posture in which she was posed, she was tied up for sexual pleasure. Contrary to defendant's argument, "any" bondage under section 11-23.5(a) does not require restraint to the extent that M.A. could not remove her wrists from the fabric loops. The image clearly shows that M.A.'s wrists are bound by the fabric loops hanging from the curtain rod, thus constituting restraint, regardless of the degree of "escapability" of such restraint. The statute also does not contain any requirement that the subject in such an image be receiving sexual pleasure at the time.

¶ 130   Moreover, defendant's argument that the subject image does not portray "sexual activity" is particularly disingenuous when considering State's exhibit 3, the text message and attached

photograph defendant sent to M.A. in response to the subject image. Defendant attached a photograph of a shirtless male wearing pants while holding his penis with his hand over the garment and the penis under the garment, and specifically stated to M.A.:

> "Please know I am thinking of you at this moment *** I have never sent such a picture to anyone. But given the pics you've entrusted to me, quid pro quo seems appropriate given the current state of our relationship."

Defendant expressly mentioned a "quid pro quo" in his text message, and it strains credulity to accept his argument that the subject image of M.A. does not portray sexual activity as provided under section 11-23.5(a).

¶ 131 Defendant's proposed interpretation and application of section 11-23.5(a) is impractical and inconsistent with the commonsense purpose of the statute—to protect the privacy of citizens in this State. The circuit court, as trier of fact, concluded that the subject image both factually and legally depicted bondage pursuant to the statute. We will not substitute our judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 224-25. In sum, we hold that there was sufficient evidence that the private image defendant disseminated without consent depicted M.A. engaged in the sexual activity of bondage under section 11-23.5(a) of the Code. 720 ILCS 5/11-23.5(a) (West 2016). Viewing the evidence in the light most favorable to the State, as we must, we find that the trier of fact could have found the essential elements of section 11-23.5 beyond a reasonable doubt.

¶ 132                    B. Vagueness of the Statute

¶ 133 Defendant next argues that, because section 11-23.5(a) of the Code fails to contain a definition for the term, "bondage," the statute is unconstitutionally vague on its face. He contends that bondage does not have a generally understood meaning. He argues that there are no set of

circumstances in which an accused can know with certainty if the statutory term "any bondage" applies to his or her conduct.

¶ 134   In *Wilson*, 2012 IL 112026, ¶¶ 21-24, our supreme court outlined the framework for a constitutional vagueness analysis. Vagueness challenges are grounded in the constitutional principles of due process. *Id*. ¶ 21. The court considers "(1) whether the law fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits so that one may act accordingly; and (2) whether the law provides reasonable standards to law enforcement to ensure against authorizing or even encouraging arbitrary and discriminatory enforcement." *Id*. (citing *Hill*, 530 U.S. at 732). The *Wilson* court also noted that:

> "The Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties and specifically those without a *scienter* requirement because the consequences of imprecision are more severe. [Citation.] In order to succeed in a facial vagueness challenge, as opposed to an as-applied challenge, the vagueness must 'permeate[ ] the text of such a law.' " *Id*. ¶ 23 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (opinion of Stevens, J., joined by Souter and Ginsburg, JJ.)).

¶ 135   Defendant here asserts that section 11-23.5 is vague as to both applications, but primarily argues that he received inadequate notice of the forbidden conduct. First, as described in great detail above, our supreme court in *Austin* held that section 11-23.5 was not unconstitutionally vague as applied to the defendant, because her conduct fell within the statutory proscription. *Austin,* 2019 IL 123910, ¶ 115. As the court stated, a litigant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (Internal quotation marks omitted.) *Id*. ¶ 112.

¶ 136   We first note the logical inconsistency of defendant's argument. Defendant argues that the statute is facially vague, particularly as to the meaning of the term, "bondage," yet he seeks a finding from this court that the definition of bondage is limited to inescapable restraint. The statute cannot be simultaneously vague and clearly require a strict definition of bondage.

¶ 137   Nevertheless, defendant cannot complain of the vagueness of the law as applied to the conduct of others when he engaged in some conduct clearly proscribed by the statute. *Id*. Defendant claims that the vagueness of the term, "bondage," in terms of sexual activity provided him with inadequate notice. We consider whether the statute provides " 'people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits so that one may act accordingly.' " *Id*. ¶ 113 (quoting *Wilson*, 2012 IL 112026, ¶ 21).

¶ 138   Here, defendant's own text message from State's exhibit 3 clearly showed he was well-aware of the sexual nature of the subject photograph of M.A. to which his text was a "quid pro quo." "[T]he determination of whether a statute is unconstitutionally vague must be decided based on the particular facts before the court." *Id*. ¶ 112. *Austin* held that "the sharing of a private sexual image is a truly private matter." *Id*. ¶ 118. The record also shows that all the State's witnesses and the circuit court considered the subject image to reflect either "sexual activity" and/or "bondage." The image depicted the ordinary meaning of both those terms, as found by the trier of fact. Defendant's conduct in this case clearly fell within the statutory proscription and, therefore, he cannot claim that the statute was vague for lack of notice as to his conduct. Any potential vagueness as to the speech of others is irrelevant. *Id*. ¶ 115. We reject defendant's argument on this issue.

¶ 139                          C. Right to a Fair Trial

¶ 140   Defendant next argues that he was denied his right to a fair trial arising from the failure of the circuit court and the State to take any reasonable action to secure his right to have access to the

sole eyewitness to the creation of the subject photograph in State's exhibit 2, the private sexual image at issue in this case. The photograph was allegedly taken by a person who is unidentified in M.A.'s trial testimony, except for establishing that the person who took the photograph was not defendant. He contends that M.A. was neither forthright nor consistent in her responses to questions regarding the identity of the photographer. Defendant sought the identity of the photographer to potentially supply corroboration to his defense that M.A. was not engaged in sexual activity when the photograph was taken. Further, defendant argues that his access to this witness was critical because that person potentially possessed unique knowledge regarding the possibility of a defense. He argues that the denial of access to this witness deprived him of his due process right to a fair trial.

¶ 141 The State responds that defendant's claims are forfeited because he failed to object at trial or raise the issue in a posttrial motion. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (stating that when a defendant fails to object to an error at trial and include the error in a posttrial motion, he forfeits ordinary appellate review of that error). Further, the State argues that, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), defendant provided no citations to legal authority to support his claim that a witness's failure to remember a fact related to their testimony raises a due process claim.[4] Rule 341(h)(7) requires an appellant's brief to include argument,

---

[4]For example, defendant cites *People v. Pearson*, 210 Ill. App. 3d 1079 (1991), to support his argument that the prosecution refused to cooperate and honor his request to produce a witness. *Pearson*, however, is inapplicable because, in that case, the State refused to comply with a discovery order when the defendant's request for information concerned a possible confidential informant. *Id.* at 1081-83. Furthermore, and more significantly, the defendant in *Pearson* already

"which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." *Id.* Indeed, points not argued are forfeited and shall not be raised in the reply brief, in argument, or on petition for rehearing. *Id.*; see also *Graham v. Lakeview Pantry*, 2019 IL App (1st) 182003, ¶ 26 (explaining that the appellate court "is not a repository for an appellant to foist the burden of argument and research" and that an appellant who fails to develop an argument or support it with appropriate authority thus forfeits review of that argument).

¶ 142  Defendant argues in his reply brief that he is entitled to appellate review, pursuant to the second prong of the plain-error doctrine. Essentially, he accuses M.A. of perjury in that she falsely claimed to have no information about the individual who took the subject photograph, resulting in the inability of defendant to access an eyewitness to crucial occurrences. The potential testimony of the photographer would, according to defendant, potentially reveal, *inter alia*, that M.A. was capable of escaping the fabric wrist loops and was not experiencing sexual pleasure at the moment the photograph was taken. We have already discussed the "merits" of the interpretation of the statute that such testimony might support. Nonetheless, defendant contends that M.A.'s alleged falsehood necessitated some action by the circuit court, the State, and defense counsel to secure a fair trial for him. Defendant argues that, instead of taking action, the court and the State "merely sat idly by and thereby effectively denied him his constitutional right to compulsory process and a fair trial."

---

knew the identity of the person in question. *Id.* at 1084. In this case, the State did not refuse to produce a witness and defendant withdrew his motion to compel discovery.

¶ 143 The plain-error doctrine is codified in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Our supreme court has recognized that the plain-error doctrine is a " 'narrow and limited exception to the general waiver rule.' " (Internal quotation marks omitted.) *People v. Herron*, 215 Ill. 2d 167, 177 (2005) (quoting *People v. Hampton*, 149 Ill. 2d 71, 100 (1992)). We note that an alleged forfeited error, such as in this case, may qualify for review under the plain-error rule because forfeiture " 'is the failure to make the timely assertion of the right,' " as opposed to waiver, which is the " 'intentional relinquishment or abandonment of a known right.' " (Internal quotation marks omitted.) *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Plain errors may be noticed when a "clear or obvious error occurred" and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant raising a plain-error argument bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step in plain-error analysis is to determine whether there was error at all. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009); *People v. Patterson*, 217 Ill. 2d 407, 444 (2005). The ultimate question of whether a forfeited claim is reviewable as plain error is a question of law, which is reviewed *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 144 The right to confront witnesses and the right to present a defense are substantial rights, and the denial of a substantial right is plain error. See *People v. Bean*, 137 Ill. 2d 65, 81 (1990). Our federal and state constitutions guarantee criminal defendants a meaningful opportunity to present

a complete defense. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104. The sixth amendment of the United States Constitution and article I, section 8, of the Illinois Constitution guarantee a defendant the right to confront the witnesses against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. The crux of this right is the ability of a defendant to cross-examine adversarial witnesses. See *People v. Lofton*, 194 Ill. 2d 40, 53 (2000) (citing *Maryland v. Craig*, 497 U.S. 836, 844 (1990)). The defendant's due process rights are also potentially implicated because depriving the defendant of the opportunity to cross-examine the witnesses against him or her is a denial of the guarantee of due process as provided by the fourteenth amendment to the United States Constitution. U.S. Const., amend. XIV; *Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law"); *People v. Triplett*, 108 Ill. 2d 463, 474-75 (1985) (the right to confront witnesses "has been made obligatory on the States through the fourteenth amendment [citation] and includes the right to cross-examine a witness as to the witness' biases, interests, or motives to testify"). An individual's right to procedural due process entitles him or her to "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re D.W.*, 214 Ill. 2d 289, 316 (2005).

¶ 145   In this case, however, defendant conflates the right to confront a witness with his failure to procure a witness. The record clearly established that neither the circuit court nor the State *prevented* defendant from pursuing the individual who took the subject image of M.A. The State cannot provide information to defendant that it is either not aware of or cannot control. Defendant chose to withdraw his motion to compel prior to the commencement of trial and cannot now complain that somehow the trial was unfair because he did not have access to a witness that he

failed to pursue. Furthermore, defendant was able to cross-examine M.A. as to her knowledge of the identity of the individual who took the subject photograph, and the court considered the credibility of the witness and weighed the evidence.

¶ 146    During the hearing on defendant's motion for a new trial, the circuit court stated that, regarding M.A.'s credibility, "[a]m I skeptical that she does not remember who took the photograph? Of course I'm skeptical of that." However, the court next stated that concerning the elements of the offense, "most of the elements of the offense were not in dispute in regards to *** what happened here. And that is that this picture was taken." The court found that the issue of the identity of the photographer was "tangential" when considering the elements of the offense. Finally, the court stated that it was reasonable to infer that defendant sent the images to members of the school board, "and then it was up to the Court to determine whether or not this fit within the definition of bondage or sexual activity." The court reiterated that it found M.A.'s testimony as a whole to be credible. Defendant provided no evidence whatsoever that the State withheld information or that the court encouraged the withholding of information regarding the identity of the individual who took the photograph of the subject image.

¶ 147    We will not substitute our judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 224-25. Because we find no error and no due process violation, we need not address defendant's plain error argument. See *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) (when no error occurs, there can be no plain error).

¶ 148                                        D. Reversal of *Austin*

¶ 149    Finally, defendant argues that our supreme court's decision in *Austin* should be reversed. He contends that the dissenting opinion in that case sets forth the proper interpretation of the

statute, requiring a strict scrutiny analysis of the statute instead of an intermediate level of scrutiny. Defendant maintains that section 11-23.5 is neither narrowly tailored nor the least restrictive means of dealing with the nonconsensual dissemination of private sexual images.

¶ 150   As an intermediate court, we are required to follow precedents established by our supreme court. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). This court is bound to faithfully follow and apply judicial precedents established by our supreme court. *Id*. Accordingly, we follow the *Austin* decision and reject defendant's call upon an appellate court to reverse a supreme court decision.

¶ 151                               III. CONCLUSION

¶ 152   Based on the foregoing, we affirm defendant's conviction of and sentence for nonconsensual dissemination of private sexual images under section 11-23.5 of the Code. 720 ILCS 5/11-23.5 (West 2016). The judgment of the circuit court of DeKalb County is affirmed.

¶ 153   Affirmed.

*People v. Moeller*, **2024 IL App (2d) 230043**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of De Kalb County, No. 18-CF-0222; the Hon. Philip G. Montgomery, Judge, presiding. |
| **Attorneys for Appellant:** | Phyllis J. Perko, of Law Offices of Harlovic & Perko, of West Dundee, for appellant. |
| **Attorneys for Appellee:** | Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Edward R. Psenicka, and Stephanie Hout Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |